[No. F058414. Fifth Dist. Aug. 9, 2011.]

LORRAINE PANTOJA, Plaintiff and Appellant, v.
THOMAS J. ANTON et al., Defendants and Respondents.

[REDACTED]

**COUNSEL**

Rastegar & Matern, Matthew J. Matern, Rania S. Habib, Paul J. Weiner; Law Offices of Dennis P. Wilson and Dennis P. Wilson for Plaintiff and Appellant.

Clifford & Brown, John R. Szewczyk and Stephen T. Clifford for Defendants and Respondents.

**OPINION**

**WISEMAN, Acting P. J.**—In this employment discrimination case, we are asked to decide whether the court erred in not allowing the jury to hear "me too" evidence, that is, evidence of the employer's alleged gender bias in the form of harassing activity against women employees other than the plaintiff. Here, the me-too evidence related to harassing activity that occurred outside plaintiff's presence and at times other than when plaintiff was employed. At issue is whether the court properly excluded this evidence as propensity or character evidence under Evidence Code section 1101, subdivision (a), or whether it should have been admitted as evidence of a discriminatory or biased intent or motive under Evidence Code section 1101, subdivision (b).

We conclude that the evidence should have been admitted and the failure to do so was prejudicial. Consequently, the judgment entered upon the jury's defense verdict must be reversed. In doing so, we fully recognize and agree that the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.) (FEHA) is not a civility code and is " 'not designed to rid the workplace of vulgarity.' " (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 295 [42 Cal.Rptr.3d 2, 132 P.3d 211] (*Lyle*).) Attempting to impose a civility code, human nature being what it is, would be an exercise in futility. Plaintiff's evidence in this case, however, if believed, would be more than "vulgarity" in the workplace.

Another issue is whether the court correctly instructed the jury with language from the Supreme Court's opinion in *Lyle*, *supra*, 38 Cal.4th at page 278. We conclude that the instruction given was a correct statement of the law. In the context of this case, however, giving it without other clarifying instructions that are also consistent with the principles and teaching of *Lyle* was error. We express no opinion regarding whether the particular proposed clarifying instructions requested in this case were appropriate.

In addition, we conclude that, by granting defendants' motion in limine to exclude evidence of plaintiff's supervisor's use of the word "Mexicans," and rejecting proffers of similar evidence during trial, the court in effect improperly granted relief equivalent to summary adjudication against plaintiff's claim alleging racial discrimination. Finally, we conclude the court did not abuse its discretion when it excluded evidence offered to rehabilitate one of plaintiff's witnesses after defendants impeached that witness.

The judgment is reversed.

## *FACTUAL AND PROCEDURAL HISTORIES*

Plaintiff Lorraine Pantoja filed her complaint in the trial court on March 11, 2004, naming as defendants Attorney Thomas J. Anton and his professional corporation, Thomas Anton & Associates. The complaint alleged that Pantoja began working as an employee of Anton's firm in January 2002. It further alleged that, while Pantoja was working there, Anton slapped Pantoja's buttocks, touched her buttocks, touched her leg while offering her $200, and asked for a shoulder massage. He referred to his employees as "my Mexicans." Finally, he called Pantoja a "stupid bitch" and fired her. It was later established that the firing took place in October 2002.

The complaint alleged violations of the FEHA, wrongful termination in violation of public policy, battery, sexual battery, and intentional infliction of emotional distress. The causes of action for battery, sexual battery, and intentional infliction of emotional distress were dismissed by Pantoja during trial. The cause of action for wrongful termination in violation of public policy was nonsuited. These causes of action are not at issue in this appeal. Only the FEHA claims remained. The complaint included a cause of action referring to FEHA violations in general terms and another cause of action referring to racial discrimination. It was clear at trial that Pantoja was also claiming sex discrimination (Anton fired her because she was a woman) and sexual harassment in the form of a hostile work environment created by Anton's words and behavior.

Defendants filed several motions in limine. Two of these are at issue in this appeal. In motion in limine No. 1, defendants sought to exclude evidence of

racial bias on Anton's part. Specifically, Pantoja had claimed in a deposition that on one occasion she heard Anton use the word "Mexicans" in a way she considered derogatory. Defendants' motion argued that the "court should exclude any reference to the term 'Mexicans' in any context in this case." They contended that, because Pantoja had only said she heard Anton use the word once, its use was occasional or sporadic and therefore could not establish a racially harassing environment. They also argued that the evidence would be substantially more prejudicial than probative and should be excluded under Evidence Code section 352.

In motion in limine No. 2, defendants sought exclusion of all evidence of acts of discrimination and harassment unless Pantoja "personally witnessed such acts" and the acts "adversely affected her working environment." Defendants argued that this would be improper character evidence and would be substantially more prejudicial than probative under Evidence Code section 352.

On May 20 and 21, 2009, the court granted both motions. On motion in limine No. 1, the court cited cases holding that proof of racial harassment requires evidence of a continuously or pervasively hostile environment. The court acknowledged, however, that a single racial slur can be actionable if accompanied by other conduct. Pantoja's counsel made an offer of proof of accompanying conduct, specifically that Pantoja would testify that Anton "called her bitch, used other expletives, harassed her, berated her, and ultimately terminated her." The court stated that this offer of proof did not persuade it to deny the motion, but that it would be willing to "readdress the matter" during trial if Pantoja actually presented evidence supporting the claim of racial discrimination or harassment.

Regarding motion in limine No. 2, the court stated that witnesses other than Pantoja would be permitted to testify about discriminatory or harassing events they witnessed only after presentation of foundational evidence that those events took place while Pantoja was an employee and that she perceived or was affected by them. It stated that this ruling was preliminary and could be revisited during trial "if foundational matters or other evidence establishes the need to go into areas [that] would otherwise be precluded by the ruling on the motion."

Witness testimony began on May 26, 2009, and Pantoja called Anton as her first witness pursuant to Evidence Code section 776. He testified that he had handled sexual harassment cases, representing both plaintiffs and defendants, and had taught seminars on sexual harassment. Pantoja's counsel asked Anton a series of questions about whether he ever engaged in sexually harassing conduct: "[Y]ou've never touched anybody's buttocks at the workplace, correct?" "[Y]ou've never made comments about anybody's breasts at

the workplace, correct?" "[Y]ou've never put your hand inappropriately on any female at the workplace, correct?" Anton answered affirmatively each time. Defense counsel objected, saying that it was irrelevant whether Anton *ever* did these things, and "may be an issue in regard to one of the Court's orders," presumably its in limine order barring testimony about harassment and discrimination that did not affect or take place in Pantoja's presence. The court sustained the objection and instructed the jury to disregard the testimony.

Pantoja's counsel asked whether Anton had ever called Pantoja a bitch. Anton said no. Counsel then asked whether Anton had ever called anyone a bitch. Defense counsel's objection was sustained. Pantoja's counsel asked whether Anton had touched Pantoja's buttocks on a certain occasion. Anton said no. Counsel asked whether Anton had touched the buttocks of his other female employees. Anton said no as defense counsel objected. The court sustained the objection after a sidebar.

When Pantoja's counsel asked similar questions limited to the time of Pantoja's employment in Anton's office, Anton answered and his counsel did not object. In response to these questions, Anton denied that he touched female employees' buttocks or legs during that time; admitted he may have touched female employees' shoulders; admitted he adjusted an employee's bra strap that had fallen off her shoulder on one occasion; and denied that he often called women at the office bitches during the time of Pantoja's employment. When asked whether Anton had a "practice of prohibiting any type of sexual harassment" during the time Pantoja worked for him, Anton also answered affirmatively, with no objection from Anton's counsel. He said: "[W]e just didn't do it, period. And if I found out somebody was doing it, I would put an end to it. If somebody came and complained to me or to anyone else in the firm, I would put an end to it."

Anton also said he had a process in place by which employees could make complaints about sexual harassment. When Anton again denied he touched Pantoja inappropriately on a certain occasion, Pantoja's counsel asked, "And you don't think so because that's something you'd never do, correct?" Anton answered, "That's exactly right." Again, there was no objection.

The following day, May 27, Pantoja filed a supplemental trial brief again arguing for admission of "evidence of Defendant Anton's sexual harassment and racial discrimination against employees other than Plaintiff . . . ." The brief argued that the evidence was admissible for several purposes, including to impeach Anton's testimony from the day before that he would not tolerate harassment or discrimination in the office. The court did not make a ruling that day.

Anton's testimony continued. He denied that in 2002 (the year Pantoja worked for him) he would allow any employee to call another employee a bitch. He said he did not know whether he had ever directed profanities at employees during the time Pantoja worked in the office, but did not think he had done so. Counsel asked whether Anton used the word "Mexican" in an "angry tone" during the time when Pantoja worked in the office. Defense counsel objected without stating grounds (presumably relying on the in limine ruling) and the court sustained the objection. Anton again testified that, during 2002, when Pantoja worked for him, his policy was "we don't allow sexual harassment." He also denied, without objection by his counsel, that he ever commented on the way women's breasts looked at any time. He testified that if, during the time Pantoja worked for him, anyone had reported sexual harassment to him, he would have conducted an investigation.

Lydia Dunton, an accountant who had worked for Anton, testified out of order for the defense that day. During her testimony, a key theme of the defense emerged. Without any limitation with respect to time, Anton's counsel introduced the subject of Anton's use of profanity. He asked whether Anton ever used "a cuss word"; when Dunton said yes, counsel asked for examples of when he did so. Dunton explained that he did so when he was "recounting something," such as a "funny story." Then Dunton said that sometimes he used profanities angrily, but did not direct them *at individuals*: "[E]ven if he was upset about something, he might say that so and so, you know—I mean, he didn't say so and so—SOB, you know, talking about someone who had, you know, done something, whatever." Dunton expanded on this point during cross-examination, responding to a specific question about Anton's behavior toward Pantoja by making a general statement that it was not characteristic of Anton to direct profanities at individuals:

"Q. Were you ever present in a room when Mr. Anton directed profanities directly at [Lorraine] Pantoja?

"A. No. That's not his style.

"Q. When you say that's not his style, you're talking about Mr. Anton?

"A. Yeah. He didn't generally direct profanities at people. He might say, that GD so and so, you know, and he'd, you know, talking about some work that was done, or this blankety-blank file is not correct or not complete or whatever, but he never directed it at the person that he was talking to. It was always the situation or the thing or—you know, it wasn't like, you so and so, it was always like this so and so." Defendants emphasize the same idea in their appellate briefs, saying, for instance, that their "theory of the case was that [Anton's profane] behavior and language was not directed at any particular person."

Pantoja's counsel was not permitted, however, to ask Dunton whether she ever heard Anton use the word "bitch" during the time Pantoja worked at the office. The court sustained the objection that the question was "lacking in foundation." After a recess and before the jury returned, Pantoja's counsel argued that defense counsel had opened the door to Dunton's testimony on this point. He also argued that it was admissible to impeach Anton's own testimony, to show a pattern and practice of harassment, and to show a company policy of condoning harassment. The court then said it would allow Pantoja's counsel to ask Dunton whether she had ever heard Anton use that word in Pantoja's presence. When Pantoja's counsel attempted to do so, however, after a long series of questions about where Dunton and Pantoja were sitting and what could be heard from which positions, the court again sustained a defense objection based on lack of foundation. During her direct examination by defense counsel, Dunton also testified that, although Anton sometimes touched and hugged employees, the hugs were one armed and were done in an "avuncular manner." "Uncle like?" defense counsel asked. "Like an uncle, yes," said Dunton.

On the next day of trial, June 1, 2009, Pantoja filed a second supplemental trial brief arguing for admission of evidence of Anton's harassing or discriminatory conduct that was witnessed by other employees but not experienced by Pantoja. This time, Pantoja included a detailed offer of proof. She stated that Stefanie Pumphrey (formerly Escudero) would testify that she worked for Anton from April 2002 to September 2003. Pumphrey would testify that Anton put his arm around her shoulders; daily "yelled words such as 'fuck, shit, bitches' in the office"; told Pumphrey "monkeys could do your job better than you"; called her five to 10 times while she was on vacation and left "angry obscene messages, such as 'You fucking bitch, you fucked everything up' "; fired her and hired her back; stared at employee Erica Garcia (formerly Pitts) while Garcia stood on a ladder and said, "I could see right through that skirt"; put his arms around other employees; used obscene language in speaking to other employees; told other employees they were monkeys and stupid; yelled, "Why can't I get a competent staff?"; and fired and rehired his entire staff.

Jan Humecky, who did contract work for Anton for three years, would testify that Anton went through a lot of staff because of his bad treatment of them; mistreated female employees, including Pantoja, by yelling and saying obscene and insulting things, including, "Why can't I fucking get a good staff?"; "What the fuck is wrong with you?"; and "Bitch, stupid, idiot, incompetent"; and frequently caused the female staff members to cry by behaving in this way.

Lisa Wilbanks, who worked for Anton from August to September 2003, would testify to all of the following: Anton daily leered at his female

employees, especially at their buttocks. He yelled angrily at staff on a daily basis and made obscene remarks, including, "Why can't I fucking get a good staff?"; "What the fuck is wrong with you?"; "Are you a fucking idiot?"; "You are fucking worthless"; "Stupid!"; and "Why can't I get a competent staff?" He asked Erica Garcia what was written on the elastic band of her underwear and then pulled the band out to see. He stared at Garcia while she stood on a ladder and said, "You should wear see-through dresses more often and get up on the ladder." He told Garcia, "You have your head up your ass." Daily, he made inappropriate comments to an employee named Leanne about her clothes and body. He told Wilbanks, when she needed to take her son to the orthodontist, "Don't you ever put your family before this office." He swore at Wilbanks for forgetting to tell Garcia to pick up Anton's dry cleaning, and then slammed money down on a desk and told Wilbanks, "Why don't you fucking get the pants?" He grabbed Wilbanks's arm after Wilbanks gave notice because of this incident, saying, "You'd better think about this." He caused Wilbanks to have panic attacks with his daily outbursts. He yelled at a woman and threatened to have her arrested because she "parked her car where [he] thought a trash can should be."

Erica Garcia worked for Anton from June 2003 to May 2004 and would testify that Anton suggested Garcia was less competent than Leanne because of her race (Garcia was Hispanic); separated Garcia from Leanne because of her race; said, in the presence of employees, "[I] have three Mexicans working for me. I've never had that many working for me before. Usually you hire Mexicans to do your maid work"; said Garcia "has her head up her ass"; said, "If you don't get your head out of your ass, I'll stick it up my ass and see how you like it"; made comments to Garcia and Leanne about their bust sizes, including the comment that, "[i]f we get T-shirts for the office, we'd have to get extra large because both of your chests are so big"; patted Garcia and Leanne on their buttocks and thighs at least three times, in the presence of other female employees; three times became suddenly enraged, fired Garcia, and rehired her as she was packing to leave; gave Garcia a raise for good work, gave her a warning letter a week later, and then decided to shred the warning letter, saying he was having a bad day because "his wife was on his case"; called or had an employee call Pumphrey every day while Pumphrey was on vacation to demand to know when she would be back; told Pumphrey by phone during this vacation, "You'd better fucking hurry up and get back or else you'll be fired"; fabricated 30 performance-evaluation letters accusing Pumphrey of poor performance after Pumphrey gave notice; told Pumphrey to "get the fuck out" and refused to give her her final paycheck; slapped Leanne on the legs and buttocks and made inappropriate comments during a dinner with a Mr. Lewis; called Leanne a "stupid idiot" after Leanne said she was returning to school; and told Leanne, "You'll never amount to anything."

At the beginning of the day on June 1, the court tentatively stated its conclusions on the supplemental trial briefs. It began by discussing *Johnson v. United Cerebral Palsy/Spastic Children's Foundation* (2009) 173 Cal.App.4th 740 [93 Cal.Rptr.3d 198] (*Johnson*), which Pantoja had cited. The trial court acknowledged that *Johnson* held that me-too evidence—evidence of harassment or discrimination experienced by employees other than a plaintiff and of which the plaintiff was not aware—could be admissible under Evidence Code section 1101, subdivision (b). It was relevant to show a defendant's discriminatory intent and to rebut the defendant's proffered innocent explanation for his conduct, and therefore might not be inadmissible character evidence under Evidence Code section 1101, subdivision (a). The trial court, however, denied that its prior rulings were in conflict with this holding.

In spite of its belief that it had conformed to the holding of *Johnson*, however, the court went on to say that the problem with the offer of proof was that it did not state that the witnesses would testify that the facts about which they had knowledge happened during the time when Pantoja worked for Anton or affected Pantoja's experience. The court also rejected Pantoja's argument that Anton opened the door to the me-too evidence or could be impeached by it because it contradicted his claims about not tolerating harassing or discriminatory behavior. It stated that a defendant could not open the door in this manner under questioning by a plaintiff, and that Pantoja's counsel had violated the in limine order by eliciting from Anton general answers about what he would never do or tolerate, since those answers were not limited to the time period when Pantoja worked in the office. After hearing argument, the court reaffirmed these views. The court also indicated that its rulings really concerned the order of proof, and that the problem with Pantoja's proffer was that it was not the actual evidence. The court commented, "This isn't a court of appeal. It's a trial court, and I can't try the case on paper. It has to be done by witnesses, and it has to be done by evidence."

A fair reading of the court's ruling, in the context of the offer of proof and the parties' arguments, is that the court believed the me-too evidence was inadmissible either to prove Anton's intent under Evidence Code section 1101, subdivision (b), or to impeach Anton, because it did not concern facts that took place while Pantoja was an employee or have an effect on Pantoja's experience as an employee.

The court specified that the testimony of Wilbanks and Garcia could not come in because they were not employed at Anton's firm at the same time as Pantoja. It stated that the offer of proof did not make clear whether Pumphrey and Humecky worked for Anton during Pantoja's tenure. As will be seen, Pumphrey and Humecky did work for Anton while Pantoja was an employee, and they were allowed to testify about events that happened in Pantoja's presence. Wilbanks and Garcia did not testify.

Pantoja continued presenting her evidence. Besides Anton's testimony under Evidence Code section 776, Pantoja's case consisted of her own testimony and that of other former Anton employees discussing Anton's behavior, limited to the time when Pantoja worked in the office and also limited to circumstances by which Pantoja was affected, for instance, because she was present.

Pantoja testified that she was hired by Anton as a receptionist and a secretary but that, in addition to those duties, Anton often also required her to prepare his lunch and run personal errands for him, including taking his laundry to the cleaners and taking his car to be washed. Anton frequently castigated her about her performance in all these responsibilities, and often called her demeaning names and addressed her in foul language: "He would say 'fucking' a lot. He would say—I don't like these bad words. He would say 'stupid bitch,' 'dumb bitch,' 'incompetent bitch.' He used other words like 'motherfucker.' [¶] . . . [¶] He called me stupid bitch. 'Can't you do this right?' Or 'Can't you cut this fucking cheese thinner? Why are you so fucking incompetent? Can't you find a fucking address?' [¶] . . . [¶] . . . 'You put too much fucking dressing.' "

According to Pantoja, "bitch" was a name Anton frequently called her, but there were other profane and belittling expressions he often directed at her: "I was called a stupid bitch almost all the time. Whenever something wasn't done right in his office, he'd call me a stupid bitch or a fucking bitch. He [also] always used the word[s], 'You have your head in your ass.' "

One day, Pantoja said, she was working when Anton passed behind her. As he passed, "he said, 'Fucking' c-u-n-t." Pantoja spelled the word in court, but Anton had spoken it. She did not know whether this epithet was directed at her. She found it hard to believe he had really said it, but later believed it when she heard him use the word again a couple of weeks later, referring to someone as " '[t]hat fucking' c-u-n-t."

Anton ridiculed Pantoja in intimate terms any time he saw her sweating from nervousness because of his verbal abuse. Pantoja said: "I would sweat when Mr. Anton would yell at me because I was embarrassed. And I used to sweat a lot when—because of my embarrassment. At one time I was sweating, he—every time I would sweat, he would ask me if I was going through menopause. Not every time I was sweating. Every time he would see me sweat, he would ask me if I was going through menopause." Pantoja found these remarks to be humiliating.

Pantoja testified that she witnessed similar behavior by Anton directed at other female employees. She heard him yelling at Linda Tesillo as he fired

her. "He told her, 'Get the fuck out of my office. You're fired. You stupid bitch, get out of my office or I'll call the cops on you.' " "He said, 'Fuck all you employees.' He said, 'Why can't I get a fucking better staff?' He would slam the door. He cursed at other women, calling them 'little bitch.' " Speaking in Pantoja's presence, he referred to an employee named Diane Pesta as a "little bitch" and one named Rhendia Brandenburg as a "fucking bitch."

Pantoja also testified that on three occasions, Anton touched her on her buttocks or her thigh in a way she considered inappropriate. He slapped her buttocks one day as he passed her in the hallway, while she was standing in a doorway, speaking to another employee. She jumped, and was shocked. He then motioned to her to come into his office, where he told her to go out and get his lunch. She did not complain to Anton about this, because she believed he would yell at her, as he so often did. She believed she would be fired if she complained to anyone else. She was not aware of any policy or reporting procedure in the office for sexual harassment complaints.

On another occasion, Pantoja was assigned the task of driving Anton to Fresno for the groundbreaking ceremony for the new federal courthouse. On the way back, Anton was speaking to someone on his cell phone. "He said, 'I wouldn't mind getting into that bitch's pants.' " Pantoja thought the way he said this "sounded dirty." She testified, "He wasn't speaking to me directly, but I felt like if he was speaking to me." Anton then hung up the phone, rubbed Pantoja's thigh with his hand and asked her if she was okay. As he moved his hand on her leg, her skirt began to move up. She testified, "I was scared because we were in the middle of nowhere. . . . There was no houses on this side. There was nothing there. It was just fields of nowhere—nowhere to run. Just—I didn't want to provoke him yelling or doing anything, so I didn't say anything to him." After about a minute, Anton removed his hand from Pantoja's leg and said, "I know you missed a week of work. I'm going to give you $200, but that's between me and you." Pantoja testified, "I thought he was offering me money to do something with him." Before they got back to Bakersfield, Anton told Pantoja to stop at a mall. They went in and Anton bought shirts and ties. Pantoja said to herself, "Why am I shopping with him? Why am I going places with him? I'm not his girlfriend. I'm not his wife."

The third instance of unwanted touching happened when Pantoja was in Anton's office, delivering the lunch she had prepared for him. He customarily asked to have his plate set on the floor. As she bent over to put it there, she felt Anton's hand on her buttocks. As he touched her, Anton said, "Bring me some milk, Dear." Pantoja felt "dirty," "embarrassed," and "humiliated." She again did not complain because she thought she would get in trouble and Anton would scream.

Pantoja further testified that Anton once asked her to massage his shoulder. One evening as she and two other employees were about to leave for the day, Anton, sitting at his desk, called Pantoja over, said his neck or shoulder hurt, and asked her to massage it. She did so. She did not want to do it, but believed he would yell at her and maybe fire her if she refused. After a few minutes, he thanked her and she quickly left.

Pantoja saw Anton give Stefanie Pumphrey a hug that was inappropriate—it "wasn't the right kind of hug."

The cumulative effect of Anton's behavior on Pantoja was that she dreaded coming to work. "I felt I didn't want to come to work. I felt—I hated having to go to work. I dreaded having to see him. I always wished or prayed that he would be in court somewhere or not there at all, but I had to come to work. I would come to work because I had to." Pantoja further testified, "I felt embarrassed. I felt, of course, humiliated. I was depressed. I didn't want to work anymore. I felt ashamed. I felt belittled. I felt—I hated myself." She bit her nails until they bled and had frequent nightmares in which she was trapped in Anton's office with no windows or doors.

There was one occasion when Anton touched Pantoja in a way Pantoja did not find offensive. An attorney formerly employed in Anton's office died, and Anton patted Pantoja on the shoulder.

Pantoja testified that Anton fired her twice. The first time, Anton needed a large number of photocopies made. He loudly yelled, "I don't give a fuck how you guys get this shit out. You guys need to get this motherfucking copy job done. And I don't care how it gets done, but it's going to get there." Two other employees and Pantoja started the task about 4:30 or 5:00 p.m. Pantoja expected to stay late, but no one told her how late. About 8:00, Pantoja told Anton she had to go home because the woman watching her children could not stay any longer. Anton said, "Well, if you leave, don't bother coming back." Pantoja said, "Okay," and turned to leave. "Did you hear me?" Anton shouted. "Don't bother coming back." Pantoja left in tears. During the following weekend, an employee called Pantoja and told her Anton said he was sorry and wanted her to come back on Monday. She did. When she came in, she heard Anton call from his office, "Is she here?" An employee said she was. Anton called out to Pantoja, "Come here, you motherfucker," and "Get over here, you asshole." Pantoja testified, "He made it known that I was welcome back by calling me those names, I guess."

The second time Anton fired Pantoja, ending her tenure at the firm, was in October 2002. One Sunday, another employee asked Pantoja to copy a document for Anton and leave it out on a counter. According to her

testimony, she did so. The following morning, a different employee called Pantoja at home and said the document was nowhere to be found. Then Anton got on the phone to yell at her: "Mr. Anton grabbed the phone from [the employee] and started cussing and cursing at me, telling me, 'Where are these fucking documents, you stupid, incompetent bitch? You have shit for brains. Where are these fucking documents? You have your fucking head in your ass. Where did you put these fucking documents?' [¶] He goes, 'You're fired. Don't fucking bother coming back. You hear me? You're fired, you stupid, incompetent bitch.' "

Pantoja testified that Lydia Dunton offered Pantoja her job back on behalf of Anton. Pantoja declined.

Other former Anton employees who testified for Pantoja included Brenda Santamaria, Jan Humecky, Stefanie Pumphrey, and Linda Tesillo. Santamaria worked for the firm for about three months during the time when Pantoja worked there. She testified that one day in the office, while she was speaking with Pantoja, her bra strap fell down to the side of her shoulder. Anton, who was standing nearby, moved the strap back into position with his finger. Then he walked away. Santamaria laughed and said to Pantoja, "This man—this sick man just pulled up my bra strap."

Humecky worked for Anton for a few years as a contract paralegal. She worked with Pantoja at the firm briefly. She heard Anton call Pantoja a "stupid idiot" and "incompetent," and make her cry by screaming at her. Several times, when Pantoja was present, Humecky heard Anton say, "Why can't I fucking get good staff?" She heard Anton say "bitch" in a loud voice when Pantoja was present. Humecky also heard Anton say "[s]hit," "damn," "hell," "fuck," and "ass" in Pantoja's presence. She saw Pantoja enter Anton's office and then heard Anton yelling at her. She heard Anton directing profanities at Pantoja.

Pumphrey worked at Anton's firm in 2002 as an office manager. Her time at the firm overlapped with Pantoja's by about a month. She saw no posters about sexual harassment in the office and received no training on receiving sexual harassment claims. She heard Anton call Pantoja a "bitch" and a "fucking bitch." She testified that he directed profanities at Pantoja often. "He would just, you know, use profanity. Whether it was to tell her to get a file, whether she did something wrong, he would use the word, you know, 'bitch,' 'shit,' 'goddam it,' 'fucking.' " Anton yelled at Pantoja daily, and sometimes caused her to cry. Every time he needed a file, for instance, he would demand it using profane language. He yelled at her about the salads she made for him. "Just like, you know, 'Shit. You fucking forgot this,' or 'Can't you do this right,' you know. 'Son of a bitch, you can't get anything right.' Those are

some examples. Like I said, you know, she made salads every day." Anton routinely yelled profanities at other employees also, men as well as women. Like Pantoja and other employees, Pumphrey was once fired and rehired by Anton.

Tesillo worked as a legal secretary for Anton for a few months during the time when Pantoja was employed in the office. Often, while Pantoja was present, Tesillo heard Anton use profanities, saying, for instance, "Get me that . . . fucking file." When he did this, "everybody heard him because you could hear a pin drop in the office."

On June 4, 2009, after Pantoja had presented virtually all her other evidence, she again moved for admission of the me-too evidence. In support of the motion, she filed declarations by Wilbanks and another former Anton employee, Lisa Beatty. Wilbanks's declaration asserted the same facts as the offer of proof included in Pantoja's second supplemental trial brief, as described above. Beatty's declaration stated that she worked for Anton as an attorney for seven months in 2004 and 2005. While working at the firm, she "repeatedly heard Mr. Anton yelling and screaming at the female support staff and his male law clerk." He did not yell at Beatty. "Due to the intensity of the yelling and what was being said," she "always anticipated a physical escalation." She did not remember the specific profane words Anton used, but knew the language was offensive and demeaning. She told Anton she thought he might get sued and should stop, but Anton said he was doing nothing unlawful.

Beatty decided to quit working at the firm because of "all his yelling, screaming and abusiveness of the people in the office." Before telling Anton she was leaving, however, she wanted to finish a matter she was working on, which was going to trial. During the trial, she was riding in a car with Anton and some other people. She was in the backseat and Anton was in the front. Anton turned to face her and speak to her. As he spoke, he placed his hand on her knee, which was exposed because her skirt had moved up above it while she was sitting. She felt "shocked and repulsed." When the trial was over, she quit her job.

The court again ruled that Pantoja could not introduce evidence of harassing or discriminatory conduct by Anton toward other women when Pantoja was not present. It stated, first, that this evidence was not admissible under Evidence Code section 1101, subdivision (b), or *Johnson*: "Well, I haven't heard anything that changes my ruling with respect to the *Johnson* issue. I don't think we've reached any level of Evidence Code Section 1101(b). I don't find that there is any issue of identity, intent, or the other exceptions under 1101 that would apply. What we essentially have here is we

have allegations of misconduct against Mr. Anton, which, if true, need no other explanation. They are actionable. They speak for themselves. Those behaviors have been categorically denied that they occurred; and, therefore, we're not in a *Johnson* situation where we have an innocent explanation that then needs to be—where the issue of intent has been put at issue. I just don't see it."

Pantoja's counsel argued that Anton opened the door to the me-too evidence by testifying that he never did the kinds of things Pantoja described; the evidence was admissible to impeach the testimony. The court repeated its earlier ruling that Anton's testimony could not be impeached in this way because the testimony was elicited by Pantoja's counsel through questions that violated the in limine ruling against admission of evidence of any conduct other than conduct that took place in Pantoja's presence. Pantoja's counsel replied that Anton testified under questioning by his own counsel, and outside the scope of Pantoja's counsel's Evidence Code section 776 examination, that he had and followed a sexual harassment policy. The me-too evidence was admissible because it controverted Anton's claims on that point. The court was not persuaded.

The court ruled that Beatty could not testify for the additional reason that she actually performed work as an attorney in the present case while employed by Anton. The fact that she claimed to have been sexually harassed by him was not a "compelling reason" sufficient to justify allowing her to testify. The work she performed, according to defense counsel, was the defense of Pantoja's deposition of Brenda Santamaria.

Anton testified briefly in his own defense, adding to the denials he made when testifying during Pantoja's case under Evidence Code section 776. He stated that he did not touch Pantoja's buttocks when she was setting a plate on the floor in his office and could not have reached her in the place where she was standing. He denied using any profanities the night Pantoja had to go home at 8:00 p.m. to take care of her children. He stated he did not know the reason why she was leaving until later and rehired her after he found out. He denied he called her profane names the day she returned.

Other defense witnesses included Gabriel Godinez, Jeffrey Wise, and Diane Godinez. Gabriel Godinez was an attorney who worked for Anton in 2002, when Pantoja was an employee, and also was working for him at the time of trial. He testified that, during the time he was working there, he often heard Anton yelling and using profanity. He heard Anton say "damn it," "son of a bitch," and "fuck" when "something [was] not going right," for instance, when a client failed to provide a necessary document or was slow in paying Anton's fees. Godinez claimed Anton yelled and used profanities in the

presence of male and female staff equally, and that Anton did not direct the profanities at individuals: "It was never directed at anyone. It wasn't a 'Fuck you.' It was never 'Fuck him,' 'Fuck her.' Excuse my language, but if I can illustrate. It was like, 'Fuck. Damn it.' It could be in that context. Or 'Fuck,' you know, when something is not going right, you know. But it wasn't, 'Fuck you, you did something wrong.' It was never like that. It was always at a situation to where he would use his, you know, colorful language to let it out." Anton also often yelled just to be heard from a distance. "[T]he way that the office was situated, he used [yelling] as his intercom system," Godinez testified.

He further testified that he did not remember any time when Anton directed any profanity at Pantoja. He never heard Anton use the word "c-u-n-t." He never heard Anton call Pantoja, or anyone else, a bitch. He only used the word as part of the phrase "son of a bitch" to express frustration. He never, when Pantoja was present, heard Anton use "the term 'head up your butt.' " He never saw Anton touch Pantoja's buttocks. He saw Anton hug people sometimes, on appropriate occasions, such as the death of a staff member's relative or the birth of a staff member's child.

Jeffrey Wise, an attorney, worked for Anton from 1999 to 2004. Like Gabriel Godinez, Wise testified that he often heard Anton yelling profanities, but that Anton did so in the presence of men and women alike and directed the yelling at situations, not people. Wise gave an example in which he conceded that he might have deserved to be yelled at, but even then, although Anton was angry and used profanity, he did not direct it at Wise:

"Q. Can you tell the jury what you remember about that, Mr. Wise?

"A. Well, there was an instance where I was in charge of a case, and we had a miscommunication on obtaining experts for it, and the deadline to do so was upon us, and we hadn't retained an expert, and it was Mr. Anton's belief it was my responsibility, and I thought it was something that he was handling.

"Q. And did he use some profanity?

"A. Yes, he did. [¶] . . . [¶]

"Q. What was the context of the profanity in terms of whether or not it was directed at you?

"A. Well, missing deadlines as an attorney is one of the fatal errors that we can do, and the situation itself was very frustrating and very disturbing, so it was a pretty heated, intense moment, and I think it was directed more at the

situation that we were in because it was an avoidable situation." When pressed on cross-examination about whether he heard Anton direct profanities at any woman in the office, Wise again said Anton used profanity in frustration over situations, but did not direct profanities at people: "I know that there was profanity used in the context of events and things that occurred. I wouldn't say I heard any profanity directed at them. . . . And during those time periods, I know that those events—different events happened with different employees. There was yelling and some cursing. I don't recall any instance where he was cussing directly at a person."

Wise never saw Anton touch Pantoja in "any kind of sexual way." He sometimes saw Anton hug employees on suitable social occasions. He did not remember Anton ever swearing at Pantoja. He heard Anton say "bitch," but only as part of the phrase "son of a bitch." He once heard Anton say "motherfucker," but he did not remember whether or not this was during the time Pantoja was an employee. For a time, Wise was the most senior employee, but Pantoja never brought any complaint to him about Anton's behavior. He did recall when Anton fired the entire staff and then hired them back.

Diane Godinez was a paralegal employed by Anton. She worked for him off and on between 2001 and the time of trial. In 2002, she worked at the firm until September. Like Lydia Dunton, Gabriel Godinez, and Jeffrey Wise, Diane Godinez testified that, during the time Pantoja worked at the firm, Anton often yelled profanities in the office, in the presence of both men and women. She heard him say "son of a bitch" and "fuck." Like Anton's other witnesses, however, she testified that Anton directed these tirades at situations, not individuals: "He did not direct things like that at an individual. It was at a situation, something that had gone on that was happening, and he was in his office, and that was when he would say it."

She also testified that she never heard Anton call Pantoja a bitch, a cunt, or a motherfucking asshole or refer to her or any other employee using any curse word. She said that on the night when Anton fired Pantoja for leaving at 8:00 p.m., Pantoja had told her that she needed to leave for childcare reasons, but she had not yet relayed that information to Anton. She never knew of any complaint by Pantoja about being touched by Anton.

On June 8, 2009, the last day of testimony, Pantoja filed a declaration by Erica Garcia. It stated the same facts as the offer of proof included in Pantoja's second supplemental trial brief, as described above.

Defendants filed a motion for nonsuit on June 8, 2009. The court granted the motion on Pantoja's claim of racial discrimination, saying Pantoja had

presented no evidence supporting that claim. Pantoja's counsel pointed out that the court had barred presentation of that evidence when it granted the defense motion in limine on the issue. The court said, "[T]he record speaks for itself as to the basis for that." The court denied the motion on the claim of sexual harassment and discriminatory firing based on sex, except that it granted the motion with respect to Anton as an individual for the firing claim only. Defendants had argued that Anton was an employee of the corporation, which was the employer, and that only the employer, not an employee, could be liable for the disparate treatment on which Pantoja's discharge allegedly was based.

Next, Pantoja made a final motion for admission of the me-too evidence, now for purposes of rebuttal. Her counsel argued that the defense opened the door to this evidence by presenting its own evidence that Anton *never* engaged in the kinds of behavior Pantoja alleged. Counsel contended that the me-too evidence therefore should come in to impeach Anton and his witnesses and to rebut this line of defense.

The court rejected the request, saying the defense did not elicit testimony about Anton's behavior during periods other than the period when Pantoja worked at the firm: "I did not hear the Defense open the door in their questioning of witnesses. There were some questions that were posed by plaintiff in cross-examination that I suppose taken out of context could be interpreted to expand beyond the time period and plaintiff attempting to elicit an answer that expanded beyond the time period that applies to the plaintiff's employment, but I didn't hear the Defense do it." To the extent that evidence about other time periods came in, the court said, it was in response to questions by Pantoja's counsel. "That flies in the face of the Court's order on the motion in limine," the court stated. In light of the ruling, Pantoja presented no rebuttal evidence.

In his closing argument, part of defense counsel's strategy was simply to say that Pantoja was not a credible witness and should not be believed. He asked the jury to say to itself, "We don't think, Ms. Pantoja, you're remembering all of these things the way you're telling us." Another part of defense counsel's strategy was to suggest that Pantoja often overreacted to behavior that could not reasonably be considered offensive. He said Anton's social touching and hugging, as described by defense witnesses, was offensive "only if you are perhaps hypersensitive." "You can't just set yourself up as being particularly offended by everything that happens," he went on. Finally, defense counsel stressed the point that had been made unanimously by four of his witnesses: Although Anton often shouted profanities in frustration, he did so in the presence of men and women equally and directed his words at situations, not individuals. Counsel argued: "Under all of the

evidence in the case, we do not believe she has proved her case because of a realistic view of the evidence which suggests that her claims really lack merit. Mr. Anton ran his law office. He did not direct profanity at individuals. Profanity did occur. I acknowledged that in my opening statement, and there was testimony to that effect from witnesses on the witness stand. It was a situational thing. And that does not—that does not establish Ms. Pantoja's case."

Using a special verdict form, the jury found for the defense. To the question "Was Lorraine Pantoja subjected to unwanted harassing conduct because she was a woman," the jury answered no. It also found that the firm discharged Pantoja, but that her gender was not a motivating reason for the discharge.

Pantoja filed a motion for a new trial. She argued that, for the reasons she presented before and during trial, the court erred when it excluded the me-too evidence. She also argued that the court gave erroneous jury instructions, for reasons we will describe later. Finally, she argued that statements in a juror's declaration established grounds for a new trial.[1]

Pantoja's motion argued that this declaration was admissible under Evidence Code section 1150. It further argued that the declaration showed that the jurors made statements to each other that improperly influenced the verdict.

The court denied the motion.

## DISCUSSION

### I. *Me-too evidence of sexual harassment*

Pantoja argues that the court erred when it ruled, both before and during trial, that evidence of sexual harassment by Anton of other employees was admissible only if it took place in Pantoja's presence or otherwise affected her working environment. We agree that it was error for the court not to admit this evidence.

█ The court's in limine ruling erroneously disregarded the possibility that this me-too evidence could be relevant to prove Anton's intent when he used profanity and touched employees. Further, by the time the defense had

---

[1] The juror's declaration essentially stated that it "would have greatly helped us to find for Ms. Pantoja" if the jury had heard evidence that Anton had sexually harassed others besides Pantoja.

presented its case, it had become clear that Anton's intent was an issue in dispute, contrary to the court's belief. Anton's case was premised on the claim that his frequent use of profanity at a loud volume was always directed at situations, not people; it happened in the presence of men as well as women; and Anton never would have tolerated harassing behavior by anyone in his office, let alone perpetrated it himself. To the contrary, evidence that Anton harassed other women outside Pantoja's presence could have assisted the jury not by showing that Anton had a propensity to harass women sexually, but by showing that he harbored a discriminatory intent or bias based on gender. It would have enabled the jury to evaluate the credibility of his and his other witnesses' assertions that, although he yelled profanities in the office, he did not use the words Pantoja claimed; he did not direct profanities at Pantoja; and he did not have a discriminatory intent. We conclude the evidence was admissible to show intent under Evidence Code section 1101, subdivision (b), to impeach Anton's credibility as a witness, and to rebut factual claims made by defense witnesses.

We begin with a discussion of Evidence Code section 1101 (section 1101) and two cases on which the parties rely, *Beyda v. City of Los Angeles* (1998) 65 Cal.App.4th 511 [76 Cal.Rptr.2d 547] (*Beyda*) and *Johnson, supra,* 173 Cal.App.4th 740. Section 1101 provides:

"(a) Except as provided in this section and Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.

"(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act.

"(c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

The Law Revision Commission comments on this section explain that section 1101, subdivision (a) codified existing law to exclude character evidence in civil cases for three reasons: "*First,* character evidence is of slight probative value and may be very prejudicial. *Second,* character evidence tends to distract the trier of fact from the main question of what

actually happened on the particular occasion and permits the trier of fact to reward the good man and to punish the bad man because of their respective characters. *Third*, introduction of character evidence may result in confusion of issues and require extended collateral inquiry." (Cal. Law Revision Com. com., 29B pt. 3B West's Ann. Evid. Code (2009 ed.) foll. § 1101, p. 221.) The commission further explained that under section 1101, subdivision (b), which also codified existing law, the section "does not prohibit the admission of evidence of misconduct when it is offered as evidence of some other fact in issue, such as motive, common scheme or plan, preparation, intent, knowledge, identity, or absence of mistake or accident." (Cal. Law Revision Com. com., 29B pt. 3B West's Ann. Evid. Code, *supra*, foll. § 1101, p. 222.)

■ *Beyda* stands for the proposition that, in a sexual harassment case, section 1101, subdivision (a), bars evidence of sexual harassment of other employees, unknown to the plaintiff, if it is offered to prove a defendant's propensity to harass. Beyda was an aide to a member of the Los Angeles City Council. She claimed that the member and some other staffers sexually harassed her. (*Beyda, supra*, 65 Cal.App.4th at p. 515.) The trial court granted a defense motion in limine to exclude evidence of sexual harassment by the defendants of other employees unless Beyda was present when it happened. After a bench trial, the court found for the defense. (*Id.* at p. 516.) The Court of Appeal affirmed. (*Id.* at p. 515.) Applying section 1101, subdivision (a), the court "reject[ed] the use of the proffered evidence of other acts of harassment by respondents to prove that they engaged in similar conduct against appellant." (*Beyda, supra*, at p. 518.) The court rejected the view that the plaintiff must directly perceive the harassment (*id.* at p. 520), but held that the plaintiff must at least have knowledge of it for it to be relevant to the question of whether the plaintiff experienced a hostile environment. ■ Justice Epstein wrote: "Harassment against others in the workplace is only relevant to the plaintiff's case if she has personal knowledge of it. Unless plaintiff witnesses the conduct against others, or is otherwise aware of it, that conduct cannot alter the conditions of her employment and create an abusive working environment. Stated another way, a reasonable person in plaintiff's position would not find the environment hostile or abusive unless that person had knowledge of the objectionable conduct toward others." (*Beyda, supra*, 65 Cal.App.4th at p. 520.)

*Beyda* does not address the issue of when this type of evidence is admissible to prove intent or the other matters listed in section 1101, subdivision (b). The plaintiff apparently did not argue that the evidence was admissible for any of those purposes and consequently the case understandably did not address that issue. (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689] ["an opinion is not authority for a proposition not therein considered"].)

On the other hand, *Johnson* did consider the admissibility of me-too evidence under section 1101, subdivision (b), in the analogous situation of a FEHA claim for pregnancy discrimination. Johnson claimed her employer fired her because she was pregnant. In opposing the defendant's motion for summary judgment, Johnson submitted evidence that the defendant had fired other women because they were pregnant. The evidence was declarations of five former employees who claimed they were fired or otherwise discriminated against after telling the employer they were pregnant. The trial court granted the motion. (*Johnson, supra,* 173 Cal.App.4th at pp. 744–745, 761–762.) On appeal, Johnson argued that the me-too evidence supported her contention that there were triable issues of fact. (*Id.* at p. 759.) The Court of Appeal agreed and reversed on this basis among others. (*Ibid.*) It rejected the defendant's contention that the declarations were inadmissible propensity evidence under *Beyda.* (*Johnson, supra,* at p. 760.) Justice Croskey wrote: "*Beyda* did not address whether the evidence could be admitted under the provisions of subdivision (b) of Evidence Code section 1101. As discussed below, many courts have held that evidence of the type sought to be introduced by the plaintiff in *Beyda,* and by the plaintiff in the instant case, is admissible under rule 404(b) of the Federal Rules of Evidence ... to show intent or motive, for the purpose of casting doubt on an employer's stated reason for an adverse employment action, and thereby creating a triable issue of material fact as to whether the stated reason was merely a pretext and the actual reason was wrongful under employment law." (*Johnson, supra,* 173 Cal.App.4th at p. 760.)

The court went on to describe several federal cases so holding under title VII of the Civil Rights Act of 1964 (Pub.L. No. 88-352 (July 2, 1964) 78 Stat. 241), and to adopt their reasoning and apply it to the FEHA context. (*Johnson, supra,* 173 Cal.App.4th at pp. 763–766.) This was appropriate, for, as the California Supreme Court has observed with approval, "California courts frequently seek guidance from Title VII decisions when interpreting the FEHA and its prohibitions against sexual harassment" because of the similarities between the federal and California statutes. (*Lyle, supra,* 38 Cal.4th at p. 278.)

The cases relied on by *Johnson* included *Obrey v. Johnson* (9th Cir. 2005) 400 F.3d 691, 694–699 (evidence that other employees experienced racial discrimination in promotions admissible to show pattern and practice of discrimination, supporting plaintiff's claim that he was not promoted because of race); *Estes v. Dick Smith Ford, Inc.* (8th Cir. 1988) 856 F.2d 1097, 1102–1104 (evidence of racial discrimination in hiring and in treatment of customers admissible to show climate of bias, supporting plaintiff's claim he was fired because of race); *Heyne v. Caruso* (9th Cir. 1995) 69 F.3d 1475, 1479–1480 (testimony of other female employees that employer sexually harassed them admissible to support plaintiff's claim of quid pro quo

sexual harassment; evidence can prove discriminatory motivation and intent because it tends "to demonstrate hostility towards a certain group" and to show employer's "general attitude of disrespect toward his female employees, and his sexual objectification of them"); *Shattuck v. Kinetic Concepts, Inc.* (5th Cir. 1995) 49 F.3d 1106, 1109–1110 (age discrimination; "[t]here is no proscription of evidence of discrimination against other members of the plaintiff's protected class; to the contrary, such evidence may be highly probative, depending on the circumstances"); and *Spulak v. K Mart Corp.* (10th Cir. 1990) 894 F.2d 1150, 1156 ("[a]s a general rule, the testimony of other employees about their treatment by the defendant is relevant to the issue of the employer's discriminatory intent"), overruled on other grounds in *Hazen Paper Co. v. Biggins* (1993) 507 U.S. 604 [123 L.Ed.2d 338, 113 S.Ct. 1701].

*Johnson* discussed *Estes*, with approval, at some length: "The *Estes* court observed that a wholesale exclusion of such evidence 'can be especially damaging in employment discrimination cases, in which plaintiffs must face the difficult task of persuading the fact-finder to disbelieve an employer's account of its own motives.' (*Estes, supra,* 856 F.2d at p. 1103.) The court then went on to quote from *Riordan v. Kempiners* (7th Cir. 1987) 831 F.2d 690, where that court observed that the law tries to protect employees from being treated more harshly than they would be treated ' "if they were a different race, sex, religion, or national origin, but it has difficulty achieving this goal because it is so easy to concoct a plausible reason for . . . firing . . . a worker who is not superlative. A plaintiff's ability to prove discrimination indirectly, circumstantially, must not be crippled by evidentiary rulings that keep out probative evidence because of crabbed notions of relevance or excessive mistrust of juries." ' (*Estes, supra,* 856 F.2d at p. 1103.) The *Estes* court observed that such '[c]ircumstantial proof of discrimination typically includes unflattering testimony about the employer's history and work practices—evidence which in other kinds of cases may well unfairly prejudice the jury against the defendant. In discrimination cases, however, such background evidence may be critical for the jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive.' (*Ibid.*) The court also stated that the defendant in *Estes* had 'confuse[d] the sufficiency of evidence to establish a violation with its admissibility. Evidence of prior acts of discrimination is relevant to an employer's motive in discharging a plaintiff, even where this evidence is not extensive enough to establish discriminatory animus by itself.' (*Id.* at p. 1104.) The court added that although the jury might not have accepted the plaintiff's version of events at work, 'he should have been allowed to present this evidence at trial.' (*Ibid.*)" (*Johnson, supra,* 173 Cal.App.4th at p. 764.)

The *Johnson* court concluded that, under this kind of reasoning, the evidence of pregnancy discrimination against other employees "sets out

factual scenarios related by former employees of defendant that are sufficiently similar to the one presented by plaintiff concerning her own discharge by defendant" to be relevant under section 1101, subdivision (b). (*Johnson, supra,* 173 Cal.App.4th at p. 767.) The court also applied Evidence Code section 352 (having previously noted the similarity between that section and rule 403 of the Fed. Rules Evid., 28 U.S.C.) and concluded that the probative value of the evidence clearly outweighed any prejudice to the defendants. (*Johnson, supra,* at pp. 763, fn. 16, 767.)

The reasoning in *Johnson* is persuasive. It applies directly to Pantoja's claim that Anton's behavior toward her arguably revealed a gender bias that motivated her firing. The excluded evidence tended to show that Anton harbored a gender bias and therefore tended to disprove the ostensible reason for her dismissal.

■ *Johnson* also applies by analogy to Pantoja's claim of hostile environment sexual harassment. Like her claim that gender discrimination motivated her firing, Pantoja's claim of hostile environment harassment required her to show a discriminatory intent on Anton's part. A claim for hostile environment sexual harassment exists under the FEHA where the plaintiff was subjected to unwelcome conduct or comments because of his or her sex and the result was harassment so severe or pervasive that the conditions of the plaintiff's employment were altered. (*Lyle, supra,* 38 Cal.4th at p. 279.) The plaintiff must show that the harassing conduct took place because of the plaintiff's sex, but need not show that the conduct was motivated by sexual desire. (*Singleton v. United States Gypsum Co.* (2006) 140 Cal.App.4th 1547, 1564 [45 Cal.Rptr.3d 597]; see also *Oncale v. Sundowner Offshore Services, Inc.* (1998) 523 U.S. 75, 80 [140 L.Ed.2d 201, 118 S.Ct. 998] [same principle applies under tit. VII].) For example, a female plaintiff can prevail by showing that the harassment was because of the defendant's bias against women; she need not show that it was because of the defendant's sexual interest in women. In every case, however, the plaintiff must show a discriminatory intent or motivation based on gender. It follows that if the me-too evidence was probative of Anton's intent in behaving as Pantoja alleged, tending to show that gender bias motivated the alleged unwanted touching, shouting, and epithets, then that evidence was admissible under section 1101, subdivision (b). It was not made inadmissible under section 1101, subdivision (a), assuming it was not substantially more prejudicial than probative under Evidence Code section 352.

■ We recognize that the *kind* of intent or motivation required for hostile environment harassment may be different from the kind required for discriminatory hiring or firing. An employer may refuse to hire a woman because the employer thinks women are less competent than men. The employer may

create a hostile environment, for example, because the employer feels important or powerful while humiliating women. Either way, however, the defendant's discriminatory mental state is crucial. Sex discrimination of the first type (e.g., discriminatory hiring or firing) and sexual harassment are "distinct causes of action" under the FEHA (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460, fn. 5 [30 Cal.Rptr.3d 797, 115 P.3d 77]), but a hostile environment, to be actionable, still must constitute a form of " ' "discrimina[tion] . . . because of . . . sex" ' " (*Lyle, supra*, 38 Cal.4th at p. 280), and, in fact, the FEHA "regard[s] the prohibition against sexual harassment as part and parcel of the proscription against sexual discrimination" (*Lyle, supra*, at p. 278). There is no reason why me-too evidence would be admissible under section 1101, subdivision (b), to prove the defendant's discriminatory mental state in one type of case but not the other. In fact, evidence of one type of discriminatory conduct can even be probative of a defendant's mental state in engaging in another type of conduct. For example, evidence of a male supervisor's sexually offensive remarks to and touching of other women employees is probative of the supervisor's discriminatory intent in firing a female plaintiff for refusing to have sex with him. (*Heyne v. Caruso, supra*, 69 F.3d at pp. 1478–1479 & fn. 2, 1480.)

We conclude the trial court abused its discretion when it excluded the me-too evidence, both when ruling on defendants' in limine motion and when revisiting the issue during trial. The in limine ruling was an abuse of discretion because it was based on the erroneous assumption that the me-too evidence was inadmissible no matter what it was offered to prove. The court said it understood *Johnson, supra*, 173 Cal.App.4th 740, however, when Pantoja's counsel argued that the evidence could come in to prove intent, the court's response was that foundational evidence would be required first—by which it apparently meant evidence that the conduct took place in Pantoja's presence or was known by her. This response missed the point counsel was making about *Johnson*, for the evidence was admissible to prove Anton's intent or motive even if the conduct did not take place in Pantoja's presence and was unknown to her. The court said it would be willing to revisit the issue if foundational evidence was presented, but its view of what would be required as foundation reflected a misunderstanding of the law.

The court made a similar mistake when Pantoja's counsel again moved for admission of the me-too evidence after Anton testified under Evidence Code section 776 and, especially, after the defense had presented its evidence and Pantoja sought to use the me-too evidence for rebuttal. One reason the court gave for continuing to exclude the evidence was that defense counsel, when examining witnesses, confined his questioning to the period of Pantoja's employment, so the defense did not open the door to questioning, by way of impeachment or rebuttal, about other time periods. The court reasoned that if Pantoja's counsel succeeded in eliciting responses about other time periods

(for instance, by asking questions in the form "did you ever . . ."), this was in violation of the in limine order and Pantoja could not be allowed to benefit from doing so.

This rationale reflected the court's continued mistaken belief that, in spite of *Johnson*, evidence of Anton's harassing or discriminatory behavior toward his other female employees was inadmissible unless it happened in Pantoja's presence or Pantoja learned of it. In addition, there is no basis for the court's belief that Pantoja's counsel violated the in limine order. The in limine order barred questioning of employee witnesses about harassing conduct they witnessed that did not take place in Pantoja's presence or otherwise affect her work environment. It did not bar questioning of Anton about his general policies or practices regarding sexual harassment. We do not see how it could have done so, since an employer's policies and practices regarding harassment are facts relevant to the cause of action. An order allowing questioning about these policies and practices as they existed during Pantoja's employment but prohibiting it with respect to any other times would have made little sense. There was no reason to believe that Anton suddenly adopted policies or practices during the nine months of Pantoja's employment and abruptly discontinued them after, or vice versa.

Finally, the court's belief that all references to time periods other than the period of Pantoja's employment emanated only from questioning by plaintiff's counsel is not supported by the record. The consistent theory of defendants' case, both at trial and on appeal, is that Anton's practice was to direct his profane tirades at situations, not individuals, and his policy was not to tolerate sexual harassment. Anton's theory was not that he had this practice and policy only during the nine months when Pantoja worked for him and did not have them before or after. His theory was that he had the policy and practice all the time, or at least during the several years covered by the evidence. Even if he had advanced the theory that he had the policy and practice only while Pantoja was working for him, evidence that he did not have them at other times would have supported a rational inference that he did not have them *at all*. Either way, eyewitness testimony that he had no such policy or practice at any time was directly relevant to show his intent, to rebut his evidence, and to impeach his credibility.

The me-too evidence was relevant both to prove gender bias and to rebut the defense evidence that Anton had a policy of not tolerating harassment and a practice of not directing profanity at individuals. If, as the me-too evidence tended to show, Anton lacked this policy and practice when Pantoja was not present and during times when she was not an employee, the jury could rationally infer that he also lacked them when she was an employee and was present.

A second reason the court gave for continuing to exclude the evidence was that section 1101, subdivision (b), did not apply because Anton's intent was not at issue. The court's view was based on the idea that Pantoja's case was based on allegations "which, if true, need no other explanation. They are actionable. They speak for themselves." The court's notion was that if the jury believed Pantoja's testimony, then it would have to find liability, so evidence of Anton's discriminatory intent need not be presented.

■ There are at least two problems with this reasoning. First, discriminatory intent or bias was an element of Pantoja's causes of action for sex discrimination and sexual harassment, and the defense did not admit this element in its answer or stipulate or offer to stipulate to it at trial. Pantoja therefore was required to prove it and the court could not properly bar evidence of it by declaring it not to be in issue. It is settled that, where a defendant *admits* an element of a case in its answer or during trial, evidence offered to prove that element should be excluded. (*Fuentes v. Tucker* (1947) 31 Cal.2d 1, 4 [187 P.2d 752]; *Sumrall v. Butler* (1951) 102 Cal.App.2d 515, 519 [227 P.2d 881].) The defense made no such admission here. Consequently, Pantoja was entitled to present evidence of all the elements defendants did not admit, even if the court thought proof of one element (Anton's harassing conduct) would imply another element (Anton's discriminatory intent or bias).

■ The court's misunderstanding of this point became evident again in its written order denying Pantoja's motion for a new trial. The court stated that "plaintiff claimed specific acts of quid pro quo and hostile environment harassment by Anton, which Anton uniformly and expressly denied. Therefore, because Anton never admitted any behavior (claiming a legitimate motive or intent) motive or intent never was put at issue."[2] This is erroneous. A defendant cannot prevent an element of a cause of action from being "put at issue" by denying—even "uniformly and expressly" denying—another element of it. The jury was free to disbelieve Anton's denials of the reported conduct. If it did, it then had to decide what was Anton's intent. Further, Anton's denials were relevant only to the harassment claim, not to the discriminatory firing claim. Anton did *not* deny he fired Pantoja, and he *did* present evidence that he fired her for a nondiscriminatory reason.

Second, the jury's task was not just to decide whether it believed Pantoja and her witnesses. It also had to decide whether it believed Anton and his witnesses. Given the nature of the defense—Anton had a policy of not

---

[2] We do not know why the court referred to quid pro quo sexual harassment. Pantoja claimed that she was subjected to hostile environment sexual harassment and that she was fired because of her sex, but she did not claim quid pro quo sexual harassment.

tolerating harassment and a practice of not directing verbal abuse at individuals—the evidence of his harassment of women outside Pantoja's presence and outside the period of her employment was relevant to whether he and his witnesses should be believed. As we have said, the jury could rationally infer that if Anton did not have this policy and practice during times when Pantoja was not present, then he did not have them when she was present.

The parties' briefs separately address the question of the admissibility of the me-too evidence under section 1101, subdivision (b), to prove intent and the question of its admissibility under section 1101, subdivision (c), to impeach defense witnesses. As our discussion above indicates, the two issues are inseparably intertwined in this case. The evidence was admissible under subdivision (b) to show Anton's intent and to rebut his theory that he had a practice of engaging in profane tirades without bias and a policy of not tolerating harassment. It also was admissible under subdivision (c) to impeach his testimony about his intent, his policy, and his practice. (See, e.g., *Andrews v. City and County of San Francisco* (1988) 205 Cal.App.3d 938, 945–946 [252 Cal.Rptr. 716] [prior incidents of correctional officer's misconduct admissible to impeach his claim that he had " 'developed patience working with' " prisoners; "a witness who makes a sweeping statement on direct or cross-examination may open the door to use of otherwise inadmissible evidence of prior misconduct for the purpose of contradicting such testimony"].)

To the extent that the rulings were based on Evidence Code section 352, we conclude the rulings were an abuse of the court's discretion. If the evidence had been admitted, the jury would have had additional grounds for believing Pantoja's contention that Anton harbored a gender bias that was expressed in his words and actions toward her, and additional grounds for disbelieving Anton's contentions that he had a policy of not tolerating harassment and a practice of not directing profanity at individuals. These were crucial issues, and the probative value of the evidence is unquestionable. The risk of a prejudicial effect was the possibility that the jury would have used the evidence improperly as evidence of a propensity to act in the manner described. A limiting instruction could have mitigated this risk sufficiently.

Defendants argue that any error was harmless. We disagree. Defendant's harmless-error argument is based on the notion that Pantoja had "no case" in any event, because there was "no proof of any actual bias or animus" on Anton's part, so the erroneous exclusion of evidence could not have made any difference. Defendants' appellate brief asserts repeatedly, starting on page 1, that there is "no evidence" in the record that the workplace conditions Pantoja alleged were connected with gender bias. If this assertion were correct, of course, it would follow that there was nothing that could be

admitted under section 1101, subdivision (b), to prove discriminatory intent or motive. This assertion, however, is not correct. The record contains ample evidence that Anton often called his women employees "bitch" in demeaning contexts and sometimes placed his hands on intimate parts of his women employees' bodies or clothing.

 This is true even if we consider only the evidence that undisputedly was admissible. "Bitch" is not a neutral word in general and especially not in the context of the other facts claimed by Pantoja in this case. There was evidence that it was used on its own—not only as part of a phrase such as "son of a bitch"—and was used as a derogatory epithet directed against women. When used in that way, the word's primary function is to express contempt for a woman or women in general. For example, a person verbally abusing a man would not call him a "bitch" unless intending to say that the man is, in some derogatory way, like a woman. When used in this context, the word can be compared to a racial slur. In conjunction with the other evidence Pantoja presented, its reported use here was probative of the user's discriminatory intent.[3] Without any question, evidence of touching by a man of a woman's buttocks or thighs without the woman's consent is relevant to the question of whether the man's actions are motivated by considerations of gender.

Absent the erroneous rulings, the jury would have heard the testimony of Lisa Wilbanks that Anton leered at female employees' buttocks frequently, pulled out the elastic of Erica Garcia's underwear to read the label, and told Garcia to wear see-through clothing. It would have heard Garcia testify that Anton said she and Leanne would need extra-large T-shirts because their breasts were large, and that Anton patted her and Leanne on their buttocks and thighs more than once. It would have heard Pumphrey testify that Anton left her a phone message calling her a "fucking bitch." There is a reasonable probability that this evidence of Anton's gender bias, which corroborated Pantoja's other evidence of Anton's gender bias, would have tipped the balance in a credibility contest like this case.[4]

---

[3] Judges sometimes fail to perceive gender-charged language for what it is. A good example of this appears in *Hocevar v. Purdue Frederick Co.* (8th Cir. 2000) 223 F.3d 721, where one judge, writing for himself only, stated: "Hocevar failed to demonstrate that the language complained about was based on sex. Offensive language was used to describe both men and women. While Amundsen described a *female* client who had treated him rudely as a 'fat fucking bitch,' he also referred to a new *male* employee as a 'fucking new guy.' " (*Id.* at p. 737 (dis. opn. of Beam, J.).) We seriously doubt that the phrase "new guy" is offensive to a man in the same way "fat bitch" is to a woman, even if "fucking" is added to both expressions.

[4] The court excluded Lisa Beatty's testimony on the additional ground that she briefly was an attorney for Anton earlier in the litigation. Beatty appears to have been an important witness on the issue of gender bias because she testified that Anton physically harassed her. The facts

The court's decision that all evidence supporting a sexual harassment plaintiff's case must be limited to evidence of specific events that took place in the plaintiff's presence had the unfortunate result of skewing the evidence. The trial transcript includes many examples of where this occurred. To illustrate how the problem played out, we include as an example the following testimony taken from the direct and cross-examination of Jan Humecky. In it, the court allowed defense counsel to ask Humecky questions designed to show that Anton did *not* have an actionable intent when he shouted obscenities, but instead directed his comments at situations rather than individuals. On the other hand, when Pantoja's counsel asked precisely analogous rebuttal questions, the trial court sustained all the objections:

"RECROSS-EXAMINATION

"BY MR. CLIFFORD [defense counsel]:

"Q. Do you remember, Ms. Humecky, on these occasions where other people were present and you heard the word 'shit' or 'bitch,' was it 'son of a bitch,' 'bitch'? Do you remember one way or the other?

"A. Both.

"Q. And these would involve situations where, as you've described, Mr. Anton was displeased or angry with something?

"A. Correct.

"Q. That would have been the situation?

"A. Correct.

"MR. CLIFFORD: All right. Those are all the questions that I have. Thank you very much.

"THE COURT: All right. May this witness be excused?

"FURTHER REDIRECT EXAMINATION

"BY MR. WILSON [plaintiff's counsel]:

of the alleged harassment do not seem to involve any privileged attorney-client communication. In the event of a retrial, Beatty's testimony should not be excluded unless some authority shows that a party's former attorney cannot testify under these circumstances.

"Q. Did Mr. Anton also direct those words at people during those situations?

"MR. CLIFFORD: Objection, your Honor. It's overbroad, lacks foundation.

"THE COURT: Sustained.

"BY MR. WILSON:

"Q. Did Mr. Anton also direct the word 'bitch' at people in those situations with regards to what Mr. Clifford had just asked you?

"MR. CLIFFORD: Objection, your Honor. It's overbroad, lacks relevance, lacks foundation.

"THE COURT: Sustained.

"BY MR. WILSON:

"Q. Did Mr. Anton direct the word 'bitch' at people during the situations you described when you were there and Lorraine Pantoja was present?

"MR. CLIFFORD: Same objections, your Honor. It's leading as well.

"THE COURT: It is the same question. The objection is sustained.

"MR. WILSON: No further questions."

There are other examples. The court sustained numerous objections to Pantoja's counsel's efforts to ask whether Pantoja ever heard Anton call her a bitch, or use other profanities toward her or other employees. For instance, Pantoja's counsel asked her, "How often would you say he directed profanities at you during the term of your employment there?" The court sustained the objections "Relevance, lack of foundation . . . overbroad." Counsel asked, "During the time that you were employed there, what profanities did Mr. Anton direct at you?" The court sustained the objections "Relevance, overbroad, nonspecific." Counsel asked, "Ms. Pantoja, did Mr. Anton ever call you a bitch while you were working there?" The court sustained the objection "[l]eading." Similarly, the court sustained an objection that the question was leading when counsel asked Pantoja whether she ever heard Anton say, "Fuck all of you employees." On the other hand, when counsel

asked similar questions that clearly were not leading,[5] such as "Did you hear Mr. Anton directing profanities at other employees in your presence at the office?" the court sustained apparently inapplicable objections, such as, "It's lacking in foundation and lacks relevance."

Counsel argued to the court that these rulings created a catch-22. If counsel asked a question about a specific profanity, the witness could not answer because the question was leading; but if counsel asked a question about profanities in general, an objection would be sustained because the question did not single out the specific profanities the court considered to be relevant. The court explained: "There is a middle ground that you must achieve. That's all I can say."

The court often excluded evidence of Pantoja's feelings about things Anton did to her and others, even though her subjective experience of a hostile environment was an element of her cause of action. For instance, the court excluded, as an improper lay opinion, Pantoja's answer to the question, "Did you ever see Mr. Anton touch other female employees at the office in a way that you considered inappropriate?" After Pantoja testified that she saw Anton touch female employees on their arms and shoulders, counsel asked whether she considered the touching inappropriate. The court sustained another improper lay-opinion objection and then stated, outside the presence of the jury, that there was no "sufficient description" of the touching to allow the opinion, because it was only a touching of an arm or shoulder, not buttocks or a leg. The court referred to Lydia Dunton's use of the term "avuncular" regarding Anton's hugs as the sort of description that would be necessary. Dunton used that term to express her lay opinion that Anton's hugs were appropriate and inoffensive—exactly the sort of lay opinion the court would not allow Pantoja to express when describing the touching that she observed.

We conclude that, in the event this case is retried, both parties need to be given the opportunity to present their evidence in an evenhanded manner. Only then will the jury be able to fulfill its responsibility of determining where the truth actually lies based on a balanced and accurate review of admissible evidence.

---

[5] We do not mean to suggest that the court was always correct when it ruled that the other questions were leading. "[D]id Mr. Anton ever call you a bitch while you were working there?" for instance, was not a leading question. It was simply the most straightforward way to ask whether Anton used an epithet that was of key importance in the case, and the ruling needlessly interfered with the ability of the jury to receive the evidence on that point. A leading question is one that "suggests the answer to the person being interrogated . . . ." (Black's Law Dict. (9th ed. 2009) p. 969, col. 2.) A question with a yes-or-no answer can be leading (*ibid.*), but is not necessarily so. "Did he call you a bitch?" calls for a yes-or-no answer, but does not suggest that yes is the right answer.

## II. *Racial discrimination evidence*

Pantoja argues that the court abused its discretion when it granted defendants' motion in limine to exclude evidence of Anton's references to Mexicans, which would have been offered to support her claim of racial discrimination. She also argues that the court abused its discretion when it excluded evidence of racial discrimination that was included in the proffer of me-too evidence she made during trial. We agree on both points.

The defense motion argued that the "court should exclude any reference to the term 'Mexicans' in any context in this case." This argument is not well taken in the context of a motion in limine in a case where the plaintiff was a Mexican-American and there was a cause of action alleging racial discrimination. Defendants claimed Pantoja did not have *enough* evidence of racial discrimination, since the fact alleged in the complaint and in Pantoja's deposition—that Anton referred to Pantoja and her coworkers as "my Mexicans"—could not, by itself, prove that Pantoja was fired because of her race or that there was a racially hostile environment at the firm. The court embraced this contention, saying in its oral ruling that it would allow "no reference to the isolated remark absent some showing of other conduct."

The court did not, and could not, rule that an arguably derogatory use of a national-origin term was not *relevant* to Pantoja's cause of action. The ruling can only mean that the excluded evidence could not *establish liability* on the cause of action absent additional evidence that had not yet been proffered. This, however, is not a proper basis for granting a motion in limine. "[M]otions in limine deal with *evidence.* May this particular document be admitted? May an expert witness testify to certain facts or conclusions? An in limine motion that seeks to exclude all evidence pertaining to part or all of a cause of action based on an argument that plaintiff lacks evidence to support part or all of the cause of action is but a disguised motion for summary adjudication." (*R & B Auto Center, Inc. v. Farmers Group, Inc.* (2006) 140 Cal.App.4th 327, 372 [44 Cal.Rptr.3d 426] (conc. opn. of Rylaarsdam, J.).) The same goes for a motion in limine that claims only that a plaintiff cannot prove her case with a specified item of evidence, as opposed to claiming the item of evidence is inadmissible. Presented only with the argument that Pantoja did not have enough evidence to establish liability— not that the evidence Pantoja had was irrelevant or otherwise inadmissible— the court should have denied the motion.

The court stated that it would reconsider the ruling if additional evidence was offered. Pantoja later proffered, in a supplemental trial brief and a declaration, testimony by Erica Garcia that she heard Anton say "[I] have three Mexicans working for me. I've never had that many working for me

before. Usually you hire Mexicans to do your maid work."[6] Since there was no overlap between the tenures of Pantoja and Garcia at the firm, however, all of Garcia's proffered testimony fell within the court's ruling that witnesses could not testify unless they had knowledge of facts that took place while Pantoja worked for Anton.

The exclusion of evidence of racial bias on this ground was an abuse of discretion for reasons similar to the reasons why the exclusion of evidence of gender bias on the same ground was an abuse of discretion. The evidence was relevant to the intent element of the racial discrimination cause of action. The excluded evidence might not have been sufficient to establish that cause of action, but defendants apparently did not take the opportunity to seek summary adjudication in the procedurally appropriate manner (i.e., by filing a motion conforming to the requirements of Code Civ. Proc., § 437c) *before* trial. Instead, defendants chose to make the request *at* trial, where the question of the weight of the evidence was for the jury.

A motion for nonsuit is, of course, a method of obtaining judgment during trial based on insufficiency of the evidence. In this case, however, the order granting defendants' motion for nonsuit was erroneous because it was based on the incorrect rulings that excluded all of Pantoja's evidence supporting the racial discrimination cause of action. We express no opinion on whether that evidence would have been enough to avoid a nonsuit if it had been admitted.

We do not see any reason why the proffered evidence would be substantially more prejudicial than probative; and defendants do not state any specific reasons why it would be. We conclude the evidence could not properly have been excluded under Evidence Code section 352.

Finally, defendants contend that if there was any error on this issue, it was not prejudicial. We need not address this question, since we are reversing the judgment for other reasons.

III. *Witness credibility rehabilitation evidence*

Pantoja argues that the court abused its discretion when it refused to permit Pantoja's counsel to elicit testimony from witness Stefanie Pumphrey to rehabilitate Pumphrey's credibility after defense counsel elicited testimony from Pumphrey that impeached her. Defendants argue that, under *People v. Zemavasky* (1942) 20 Cal.2d 56 [123 P.2d 478] (*Zemavasky*), the court not

---

[6] Pantoja's opening brief asserts that she proffered evidence of racial discrimination in three witness declarations. We have examined the places in the record cited in the brief. Only Garcia's proffered testimony referred to race or race bias.

only acted within its discretion in excluding that evidence, but was compelled to exclude it. We conclude that the court had discretion to admit the evidence, but acted within its discretion in excluding it.

As already mentioned, Pumphrey gave testimony that, among other things, corroborated Pantoja's testimony that Anton called Pantoja "bitch" and shouted other profanities at her routinely. Defense counsel impeached Pumphrey in the following exchange on cross-examination regarding the unemployment claim Pumphrey made after Anton fired her:

"Q. Did you file a claim with the unemployment—Department of Employment?

"A. Yes, I did.

"Q. And was that claim denied?

"A. Yes.

"Q. Has that left you with any animosity at all toward Mr. Anton or his firm?

"A. Yes.

"Q. You did not receive unemployment benefits?

"A. No.

"Q. Correct?

"A. Yes.

"Q. And is it fair to say that you hold this animosity toward Mr. Anton and his law firm right up to the present time?

"A. Yes.

"Q. Do you think that might have colored your testimony a little bit here today?

"A. Not at all."

On redirect, Pantoja's counsel began asking why Pumphrey had this animosity, leading immediately to an unreported sidebar conference. After the

sidebar, Pantoja's counsel asked whether Pumphrey's animosity was based solely on the denial of the unemployment claim. Pumphrey said no. Counsel asked whether the animosity was based in part on something Pumphrey learned about the unemployment proceedings later. Pumphrey said yes. Pumphrey also testified that her animosity was partly based on the abusive work environment Anton created in the office.

The next day, Pantoja's counsel sought leave to question Pumphrey further about what Pumphrey later learned about the unemployment proceedings. He made this offer of proof: "[S]he would testify, number one, at the EDD hearing she believed fraudulent documents were presented in order to deny her EDD claim that she saw; and that, number two, she subsequently learned from Erica Pitts that she, Erica Pitts, told Ms. Pumphrey that Mr. Anton had ordered Erica Pitts to prepare these documents the night before the hearing."

The court denied the request under Evidence Code section 352 on the ground that it would involve undue consumption of time: "I guess perhaps you wish to establish that her animosity is justified, but to do that, you're going to be getting into an issue that I consider a collateral matter. I just simply have to exercise my discretion on that under 352. It's a collateral matter. I don't want to retry the veracity of documents in some sort of EDD proceeding. I just want to do that because in part I'm looking at the list of witnesses that was presented to me and the time that's available to complete this trial for the plaintiff as well. So I consider that a collateral matter, and I'm not going to permit it." The court also stated that granting Pantoja's request would lead to a "minitrial of the EDD proceeding" and "getting into the basis of her termination . . . ."

Pantoja argues that the court abused its discretion. Pumphrey's testimony provided important corroboration of Pantoja's account of Anton's harassment, Pantoja argues, so the probative value of the evidence was great and could not be outweighed by a desire to finish the trial more quickly.

 On appeal, defendants rely not on Evidence Code section 352 but on *Zemavasky, supra,* 20 Cal.2d 56. In *Zemavasky,* the prosecution was allowed to examine a municipal court judge as a rebuttal character witness. The judge testified on direct examination that the defendant's reputation for honesty and morality was bad. On cross-examination, the judge admitted she was prejudiced against the defendant and wanted him to go to prison. On redirect, the prosecutor, seeking to rehabilitate her, asked why. She told of her child support orders against him and his successful efforts to evade collection. (*Id.* at p. 63.) The Supreme Court quoted, with approval, the Court of Appeal's opinion that the rehabilitation evidence on redirect was admitted erroneously: " 'The question and answer were not only improper because they tended to

bring out evidence of other wrongful acts, but also because it is an unquestioned rule of evidence that when any witness admits bias and prejudice on cross-examination, on redirect the reasons for such prejudice cannot be gone into, at least where such reasons involve other alleged offenses outside the issue. The rule, supported by many cases, is stated as follows in 70 C. J. p. 1007, §1217: ". . . nor does the witness' unqualified admission of ill will open the door to proof of the reasons therefor, especially where such reasons involve other alleged offenses outside the issue . . . ." ' " (*Zemavasky, supra,* 20 Cal.2d at p. 63.)

 On the basis of this discussion, it might appear the rule is limited to criminal cases because of the special need in criminal cases to control admission of evidence of prior offenses, or that "bias" and "prejudice" mean something more than a mere expression of hostility or dislike. The Supreme Court, however, cited a passage from Wigmore indicating that the rule applies in any kind of case where the witness admits he or she feels hostility toward the party opposing the rehabilitation testimony: "The principle is stated in 3 Wigmore on Evidence 511, section 952(2), as follows: 'When to a witness is imputed hostility to the opponent, the true process of explanation consists in showing that the facts offered do not really indicate the conclusion suggested, *i. e.,* the hostility. Thus, when the counter-evidence does not attempt to do this, but admits the hostility and desires to show that it was *justifiable by the opponent's conduct,* the offer is improper in two ways, first, because it does not at all explain away, but concedes that hostility exists, and, secondly, because it tends to prejudice unfairly the cause of the opponent by showing him to be an unjust man. For these reasons such evidence may be excluded . . . .' " (*Zemavasky, supra,* 20 Cal.2d at p. 64.)

 Witkin agrees, stating that, where a witness is impeached by evidence of his or her hostility toward a party, the witness can be rehabilitated only by evidence that there really is no hostility: "[T]he rehabilitation must be confined to contradiction, i.e., the only permissible countershowing in rehabilitation is that no such prejudice or hostility exists. If the witness actually admits the prejudice, it is wholly improper to permit him or her to recite instances of purported misconduct of the party by way of justification." (3 Witkin, Cal. Evidence (4th ed. 2000) Presentation at Trial, § 361, p. 448.)

We conclude the trial court had discretion to allow the rehabilitation on redirect. It was the defense—the proponent of the impeachment and the opponent of the rehabilitation—that first asked Pumphrey, during cross-examination, why she had animosity, eliciting the response that it had to do with the denial of her unemployment claim. As a result, the jury was effectively invited to conclude that Pumphrey was a mere disgruntled former employee, fired for cause and angry because that meant she could not collect

unemployment. We do not think the court was *required* to allow one side to exploit the rule of *Zemavasky* by using a *portion* of the evidence forbidden by *Zemavasky* to damage a witness while preventing the other side from using the rest of that evidence to rehabilitate the witness.

■ Our view, therefore, is that the court had discretion to admit the questioning on redirect under the general principles of Evidence Code sections 785 and 780, subdivision (f), which state that evidence relevant to a witness's credibility is relevant and admissible. A witness who admits hostility to a party is properly impeached by that admission, but evidence that the witness has a good reason for her hostility has a "tendency in reason" (Evid. Code, § 780) to support the witness's credibility. A person who feels hostility toward a party for no good reason is, rightly, less likely to be seen as credible than a person who feels justified hostility. Normally, the rule of *Zemavasky* would prevent the admission of this evidence despite its relevance. The rule, however, does not prevent its admission for rehabilitation where the impeaching party has already deliberately elicited a damaging portion of it. The court must have discretion to employ a suitable cure when this happens.

The court did not abuse this discretion by excluding the evidence in this case. Pantoja's trial counsel did not object when defense counsel asked, on cross-examination, why Pumphrey felt animosity toward Anton. Presumably, the reason why Pantoja's counsel did not object was that, like defense counsel, he wanted to use the inadmissible rehabilitation evidence for advantage. Both sides were trying to exploit that evidence, although neither could properly do so. One response available to the court was a curative jury instruction, but no such instruction was requested. Another was the course of action Pantoja wanted to pursue—rehabilitative questioning about Anton's alleged falsification of documents. The court was right, however, to take account of the fact that substantial time could be necessary to present evidence relevant to what Pumphrey heard about Anton's actions in the unemployment proceedings and whether it was true. It did not exceed the bounds of reason when it decided that this was not justified.

Pantoja argues that even if the evidence about Anton's alleged behavior in the unemployment proceedings was inadmissible under *Zemavasky* for the purpose of rehabilitating Pumphrey, it was admissible me-too evidence of Anton's gender and racial bias. She argues that the evidence is relevant to those issues because Anton's treatment of Pumphrey, including harassment and termination, were similar to Anton's treatment of Pantoja and reinforces the claim that he engaged in this type of treatment of Hispanic women employees for reasons of bias. Pantoja did not argue at trial that the evidence was admissible for this purpose on redirect after defense counsel impeached Pumphrey on cross-examination, so the argument is not preserved for appeal.

We have explained why me-too evidence of bias was admissible in Pantoja's case-in-chief. Whether evidence related to Anton's response to Pumphrey's unemployment claim is among the items of evidence admissible under that reasoning is a matter the trial court would have to determine as part of a new trial.

## IV. Lyle *instruction*

At the request of the defense, the court gave the following special jury instruction, based on *Lyle, supra*, 38 Cal.4th 264: "A hostile work environment/sexual harassment claim is not established where a supervisor or coworker simply uses crude or inappropriate language in front of employees without directing sexual innuendo or gender-related language toward a plaintiff or toward women in general." Pantoja argues that this instruction was erroneous, and that, even if it were not erroneous, the court should have given the additional special instructions that she requested. We conclude the instruction that was given is a correct statement of the law and was properly given; however, based on the facts of this case, the court should have given additional special instructions. We express no opinion on whether the particular special instructions Pantoja requested were the appropriate instructions.

*Lyle* involved a claim by a female employee of a television production company that the use of sexual language in the workplace by the male writers of the comedy *Friends* gave rise to a hostile work environment. (*Lyle, supra*, 38 Cal.4th at p. 271.) The Supreme Court "granted review to address whether the use of sexually coarse and vulgar language in the workplace can constitute harassment based on sex within the meaning of the FEHA . . . ." (*Id.* at p. 272.) It concluded: "Here, the record discloses that most of the sexually coarse and vulgar language at issue did not involve and was not aimed at plaintiff or other women in the workplace. Based on the totality of the undisputed circumstances, particularly the fact the *Friends* production was a creative workplace focused on generating scripts for an adult-oriented comedy show featuring sexual themes, we find no reasonable trier of fact could conclude such language constituted harassment directed at plaintiff because of her sex within the meaning of the FEHA." (*Lyle, supra*, 38 Cal.4th at p. 272.)

The court observed that, under settled case law, "evidence of hostile, sexist statements is relevant to show discrimination on the basis of sex." (*Lyle, supra*, 38 Cal.4th at p. 281.) After discussing a number of cases so holding, the court went on to make the statement upon which the court's instruction in the present case was based: "On the other hand, a hostile work environment sexual harassment claim is not established where a supervisor or coworker simply uses crude or inappropriate language in front of employees or draws a

vulgar picture, without directing sexual innuendos or gender-related language toward a plaintiff or toward women in general." (*Lyle, supra*, 38 Cal.4th at p. 282.)

The three additional instructions unsuccessfully requested by Pantoja were as follows. If given, they would have come immediately after the *Lyle* instruction the court gave:

" 'However, the pervasive use of derogatory and insulting terms relating to women generally and addressed to female employees personally may serve as evidence of a hostile environment.' [¶] . . . [¶]

" 'If, in a mixed-sex workplace, the evidence shows either that (1) the abusive language in issue was directed towards women rather than men, or (2) was directed more intensely towards women than towards men, or (3) that different sex-related abusive language was used towards women than towards men, you may infer from that the existence of a hostile environment.' [¶] . . . [¶]

" 'Even if you find the evidence of Defendants' use of vulgar or sexually disparaging language was not sufficient by itself and apart from other evidence to establish the existence of a hostile environment, you may still consider such evidence of vulgar or sexually disparaging language as relevant, together with other evidence, to establish the existence of a hostile environment.' " Like the instruction the court gave, these proposed instructions were based primarily on the *Lyle* opinion. (*Lyle, supra*, 38 Cal.4th at pp. 281–282.)

The instruction the court gave clearly was an accurate statement of the law; it was virtually a quotation of a holding in *Lyle*. We agree with Pantoja, however, that without additional instructions, the instruction given was misleading *under the circumstances of this case*. Without some form of clarification, the instruction could have caused the jury to draw the inference that harassing conduct or comments motivated by a gender-based discriminatory intent do not amount to an actionable hostile environment unless there are "sexual innuendos" or "gender-related language." This inference would be incorrect because abusive conduct that is not facially sex specific can be grounds for a hostile environment sexual harassment claim *if it is inflicted because of gender*, i.e., if men and women are treated differently and the conduct is motivated by gender bias. (See, e.g., *E.E.O.C. v. National Education Assn., Alaska* (9th Cir. 2005) 422 F.3d 840, 842.) In this case, there was evidence of both gender-related (e.g., "bitch") and non-gender-related (e.g., "fucking idiot," "fucking worthless," "[y]ou have your head up your ass") language. The instructions could have encouraged the jury to disregard

evidence of abuse that was not framed in gender-specific terms even if it believed that abuse was motivated by gender bias.

This kind of misunderstanding could arise from a facially correct quotation from *Lyle* because of the difference between the unique factual context of *Lyle* and the factual context of this case. It was undisputed that sexual and gender-based language was common in the workplace in *Lyle*. In fact, this behavior was not only common, it was expected, and the plaintiff in *Lyle*, when hired, was warned about it. The question was whether this behavior could amount to sexual harassment where there was slight or no evidence that the language was directed at women or used with a discriminatory intent as opposed to being part of a creative artistic environment. A central fact in *Lyle* was that the workplace was a production company for a television comedy that revolved largely around sex jokes. In moving for summary judgment, the defense presented evidence that the use of sexual language was simply a reflection of the nature of the company's task in producing the show, so there was no biased or discriminatory intent. The plaintiff was not able to present evidence to raise a triable issue about whether the real reason was gender bias.

This case is very different. Pantoja presented evidence that arguably would support a jury's finding that Anton used abusive language and engaged in unwanted touching because of gender. An instruction seeming to limit relevant evidence to evidence of "sexual innuendos" or "gender-related language" could have confused the jury. Pantoja wanted the jury to infer that Anton's verbal abuse and hostility toward her were motivated by gender bias even when his profanities were *not* gender specific. The instruction given, without clarification, could have caused the jury to believe the law barred this conclusion.

Defendants contend that the pattern instructions the court gave the jury on the definition of sexual harassment sufficiently covered the issue of what types of conduct were relevant.[7] Without special clarifying instructions, however, the *Lyle* instruction potentially obscured the import of these pattern instructions by too strongly emphasizing defendants' theory of the case. (See, e.g., *Smith v. Shankman* (1962) 208 Cal.App.2d 177, 187 [25 Cal.Rptr. 195] [series of instructions stated correct propositions of law but were still prejudicially erroneous because they were needlessly repetitive and gave

---

[7] The most pertinent instructions were these two: "Harassing conduct may include any of the following: A, verbal harassment such as obscene language, demeaning comments, slurs, or threats; or, B, physical harassment such as unwanted touching." "Almost any type of conduct may constitute sexual harassment. In fact, sexual harassment involves conduct, whether blatant or subtle, that discriminates against a person solely because of that person's sex. However, while harassment often stems from sexual desire, the creation of a hostile work environment need not have anything to do with sexual advances."

undue prominence to defense theory of case]; *Taha v. Finegold* (1947) 81 Cal.App.2d 536, 544 [184 P.2d 533] [instructions laying undue emphasis on plaintiff's duties over defendant's duties did not include any incorrect propositions of law but constituted reversible error because they were misleading and unfair to one side].) The instruction given highlighted defendants' theory that Anton cursed indiscriminately, and at the same time invited the jury to draw the erroneous conclusion that sexual innuendo and gender-related language were the only kinds of conduct that really mattered. It would have been difficult for the jury to resolve the tension between the *Lyle* instruction, which might have seemed to make sexual innuendo or gender-related language a prerequisite, and the pattern instructions, which described a broader category of potentially actionable behavior. This problem could have been corrected by clarifying instructions explaining that, although mere vulgarity by itself does not create a hostile environment, derogatory language of any type, *if motivated by gender bias*, can do so.

The problem with the instructions given is highlighted by the court's remarks in its written order denying Pantoja's motion for a new trial. The court wrote: "The instruction given by the court was particularly appropriate in this case where plaintiff had established by nearly undisputed testimony that Anton was prone to fits of anger, using [coarse] and vulgar epithets for all to hear in the workplace. Under these circumstances, the jury needed to remain focused upon the legal requirements for sexual harassment and not simply render a verdict because they found Anton's behavior generally objectionable or vile."

These remarks reflect precisely the erroneous interpretation that concerns us. Sexual innuendo and gender-related language are *not* among the "requirements for sexual harassment," and the jury could have found that Anton's other abusive language was motivated by gender bias.

Further, the instruction was not necessary to shield defendants from the jury's expected reaction to Anton's "generally objectionable or vile" behavior. The jury could have been cautioned not to hold against Anton any behavior it found to be offensive, but not motivated by gender or racial bias. That kind of cautionary instruction would have been compatible with both the *Lyle* instruction the court gave and the clarifying instructions it should have given.

In sum, the *Lyle* instruction the court gave was a correct statement of the law but was potentially misleading in the context of this case because it could have caused the jury to focus exclusively on the presence or absence of sexual innuendo and gender-related language and ignore the possibility of other abusive conduct motivated by gender bias. The court should have given

additional instructions to prevent this. The additional instructions need not have been the same as the instructions proposed by Pantoja, but they should, at a minimum, have made clear that abusive language or behavior of many kinds, not only sexual innuendo or gender-related language, can create an actionable hostile working environment if motivated by gender bias.

Defendants claim that if there was any error in the instructions, it was not prejudicial. We need not discuss this issue because we are reversing the judgment for the other reasons we have discussed.

V. *New trial motion*

Pantoja argues that the trial court erred when it denied her motion for a new trial based on the grounds discussed above and the juror declaration. Since we are reversing the judgment for the reasons we have discussed, it is not necessary to address this contention.

## DISPOSITION

The judgment is reversed. Pantoja is awarded her costs on appeal.

Cornell, J., and Gomes, J., concurred.

Respondents' petition for review by the Supreme Court was denied November 16, 2011, S196458.