Filed 3/10/15  Alkhaaliq v. Finnegan & Diba CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

|  |  |
|---|---|
| SHANITA ALKHAALIQ, | B253674 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC488961) |
| v. | |
| FINNEGAN & DIBA et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Joseph Kalin, Judge.  Affirmed.

Lyon Law and Geoffrey C. Lyon for Plaintiff and Appellant.

Law Offices of Howard A. Kapp and Howard A. Kapp for Defendants and Respondents.

_____

Appellant Shanita Alkhaaliq appeals from the judgment entered in favor of her former employer, respondents Finnegan & Diba and Kasey Diba, following a jury trial on her causes of action for race discrimination, religious discrimination, and wrongful termination in violation of the Fair Employment and Housing Act, Gov. Code § 12900 et seq. (FEHA). Alkhaaliq contends the trial court prejudicially erred in excluding evidence of Diba's (1) discriminatory treatment of other employees in Alkhaaliq's protected class, (2) more favorable treatment of employees outside Alkhaaliq's protected class, and (3) remarks reflecting an alleged discriminatory animus against Christians. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I.     The Lawsuit

Finnegan & Diba is a two-attorney law firm with each partner practicing in a specialized area of law. Diba, who is of Iranian descent, practices civil litigation and his partner, Reynold Finnegan, practices immigration law. Alkhaaliq, an African-American woman, was hired as Diba's legal secretary in December 2010 and was discharged in May 2012. On July 26, 2012, Alkhaaliq filed this employment action against both Diba and the firm, alleging 17 causes of action in her complaint. The trial court sustained Finnegan & Diba's demurrer to 12 of the 17 causes of action and subsequently denied its motion for summary adjudication on the remaining claims. In October 2013, the case was tried to a jury on Alkhaaliq's five remaining claims: (1) race discrimination in violation of FEHA; (2) religious discrimination in violation of FEHA; (3) wrongful termination in violation of public policy; (4) battery; and (5) failure to pay wages due on termination.[1]

---

[1]     At the close of the evidence, the trial court granted Finnegan & Diba's motion for a directed verdict on the claim for failure to pay wages due on termination. Alkhaaliq's wage claim is not at issue in this appeal.

## II.     The Evidence at Trial

### A.     Alkhaaliq's Testimony

Alkhaaliq worked as Diba's legal secretary throughout her employment with the firm. When Alkhaaliq interviewed for the position in December 2010, Diba repeatedly asked her about the origin of her last name and "what country [she] was from," but did not provide any reason for these questions. When Alkhaaliq began her employment, there were four other staff members who worked for the firm's attorneys—Bernadette Malave, Benita Tripoldi, Agnes Rubio, and Eric Ceja.[2] Alkhaaliq was the only African-American employee at the time of her hire.

Alkhaaliq's job duties as Diba's legal secretary included preparing and filing court documents, drafting correspondence, opening mail, and making telephone calls on Diba's behalf. She typically worked eight hours per day and was required to start work at 8:30 a.m. If Diba was going to be late to a court appearance scheduled for that time, he would direct Alkhaaliq to call the court and notify the clerk of the delay. Alkhaaliq only had to perform that task on three occasions during her employment. Alkhaaliq had a long commute from her home to the firm's office, and admitted that she was chronically late to work due to traffic. She also admitted that she occasionally made clerical mistakes in her work, but denied it was a chronic problem.

During Alkhaaliq's employment, Diba was unduly critical of her job performance. On a daily basis, he would yell at Alkhaaliq and threaten to fire her for minor work errors. On one occasion in February 2011, Diba approached Alkhaaliq's desk, showed her a typographical error she had made, and proceeded to bite Alkhaaliq on her arm. Diba then said, "That's what you get when you make errors." On another occasion in July 2011, after Alkhaaliq performed a task well, Diba approached her desk and twice rammed the side of her body with his head, purportedly to show her that he was pleased

---

**2**     Malave was the receptionist, Tripoldi was the office manager, Rubio was Finnegan's paralegal, and Ceja was Diba's paralegal. Malave, Tripoldi and Ceja are identified as Hispanic and Rubio as Filipino.

with her work. Alkhaaliq was not physically hurt, but felt humiliated and disrespected by both incidents. Another time during Alkhaaliq's employment, Diba touched the back of her head and told her, "Oh, no. Not you. Not you too. I thought you were natural." Alkhaaliq never saw Diba engage in this type of physical conduct with other employees and perceived such conduct to be racially motivated.

Diba also made comments to Alkhaaliq that she believed reflected a religious animus against Christians. Alkhaaliq considered herself to be a devout Christian, but she did not discuss the subject of religion at work. In October 2011, Diba asked Alkhaaliq if she was planning to take her children trick-or-treating for Halloween. When Alkhaaliq responded that she and her children were going to church, Diba asked, "[Are you] sure you're not going to the mosque?" Alkhaaliq told Diba that she was a Christian and was going to church. In December 2011, around the Christmas holiday, Diba again asked Alkhaaliq if she was going to the mosque and Alkhaaliq answered that she was going to church. At some point, Diba also asked whether Alkhaaliq or her husband had converted the other to their religion. In describing how she felt about Diba's comments, Alkhaaliq explained, "Every opportunity he gets, he keeps pushing this Muslim on me. I'm not Muslim. I'm a Christian." Alkhaaliq acknowledged that Diba never told her that he was Muslim, but then added, "He just pushed the Muslim issue on me as if I was one even though I made it clear that I wasn't."

On May 29, 2012, the date of Alkhaaliq's termination, Diba was angry because he could not find a conformed copy of a court-filed document. As Alkhaaliq was calling the court to inquire about the document, Diba screamed out "Jesus Christ" and stomped away from Alkhaaliq's desk. In response, Alkhaaliq said, "Don't use my God's name in vain." Diba immediately walked back to the desk and asked Alkhaaliq what she had said. After Alkhaaliq repeated the statement, Diba told her to leave the office for the day. A few hours later, Diba received a text message from Finnegan stating that her employment was terminated. The message did not state a reason for the termination. In a subsequent letter to Alkhaaliq, Finnegan stated that she had been terminated from her employment due to her repeated clerical errors and tardiness and her recent act of insubordination. Alkhaaliq

4

testified that she believed she was discharged because of her race and because she "stood up" to Diba when she told him not to use her God's name in vain.

## B. Coworkers' Testimony

### 1. Passion Miller

Passion Miller worked for Finnegan & Diba from September 2011 to April 2013. She was hired as a receptionist, and later became the office manager. Her job duties included answering the telephone, scheduling appointments, and managing the firm's payroll and billing. She also worked as a legal assistant to Finnegan. During Miller's employment, she and Alkhaaliq were the only African-American employees at the firm.

On one occasion in February 2012, Diba approached Miller and asked her a work-related question. When Miller responded that she would have to go to her desk to get the answer, Diba bent over, bit Miller on her arm, and then growled and walked away. On another occasion, Miller made a comment to Diba about his tan. Diba replied in a joking manner, "You know they call us sand niggers." While in the office, Miller was able to observe Diba's interactions with other employees, including Alkhaaliq. At times, Diba yelled at Alkhaaliq and complained about typographical or spelling errors that she had made. Miller once overheard Diba ask Alkhaaliq if she was planning to take her children to the mosque during a conversation about Halloween.

Miller resigned from her employment on April 19, 2013, the day after she was deposed in this case. She later sent a letter to Finnegan & Diba in which she complained about her treatment at the firm and demanded $850,000 to settle her alleged claims.

### 2. Bernadette Malave

Bernadette Malave was employed by Finnegan & Diba from August to April 2011 as a receptionist and a legal assistant to Finnegan. Her job duties included answering the telephone, directing client calls, translating for Spanish-speaking clients, and preparing paperwork for Finnegan's cases. Malave also was responsible for opening the office at 8:30 a.m. each morning, and to her knowledge, she never shared that job duty with

Alkhaaliq. During her employment, Malave was able to observe Diba's interactions with Alkhaaliq and other employees. At times, Diba spoke very loudly to Alkhaaliq, but did not scream at her. On one occasion, Malave heard Alkhaaliq suddenly scream from her desk. Shortly thereafter, Alkhaaliq told Malave that Diba had bitten her and showed Malave a bite mark on her arm. Malave's employment was terminated after she failed to call in to report that she would be absent from work.

### 3. Agnes Rubio

Agnes Rubio was a current employee of Finnegan & Diba and had been with the firm for over four years. She was Finnegan's paralegal and her job duties included preparing briefs and motions for his immigration cases. Rubio typically arrived in the office after 9:00 a.m., and admitted that she was chronically late to work. However, she stated that her job did not require her to be at her desk by 9:00 a.m., and she never had to call the court to report that an attorney was running late for a hearing. Over the course of her employment, Rubio occasionally would hear both attorneys and staff use the term "Jesus Christ" when they were upset. She was not aware of anyone in the firm complaining about the use of the term. On the day of Alkhaaliq's termination, Rubio heard Diba say "Jesus Christ" as he was standing near his office, and then heard Alkhaaliq say, "Don't use the name of the Lord God in vain." A few seconds later, Diba walked back to Alkhaaliq's desk and told her that she was done for the day. Rubio never saw Diba touch anyone in an inappropriate manner, and never heard anyone discuss race or religion in the workplace.

### C. Diba's Testimony

Diba had been practicing civil litigation since 1994. He and Finnegan founded their law firm in 1998, and Diba had been the managing partner of the firm since its inception. Diba hired Alkhaaliq to be his legal secretary in December 2010. Alkhaaliq's job duties as a legal secretary included maintaining Diba's calendar, scheduling his court appearances, collecting his mail, drafting correspondence, preparing court filings, and organizing case files. Alkhaaliq also was responsible for calling the court at 8:30 a.m. if

6

Diba was going to be late for a scheduled appearance. When Diba interviewed Alkhaaliq for the position, he specifically explained to her that she had to be in the office by 8:30 a.m. each day so that she could contact the court on his behalf when necessary. Alkhaaliq assured Diba that she could be at work by that time. During the interview, Diba asked Alkhaaliq about the origin of her last name because he wanted to know if she was fluent in other languages for work purposes. Diba made the decision to hire Alkhaaliq based on her work experience.

Less than a month after Alkhaaliq began working for Diba, he became concerned about problems in her job performance. Alkhaaliq often made spelling, grammatical, and typographical errors on court documents, and failed to properly calendar Diba's court appearances. She also was chronically late to work, and on those occasions, probationary employees who did not have a key to the office were left waiting outside. Alkhaaliq's tardiness caused stress for Diba as well because he could not rely on her to contact the court if he was running late for a hearing. Diba repeatedly counseled Alkhaaliq about her performance problems both orally and in writing. However, Alkhaaliq did not show any significant improvement in her performance, and tended to respond to Diba's counseling by deflecting the blame away from herself. On a few occasions, Diba and Alkhaaliq had heated arguments about his dissatisfaction with her work, but Diba denied that he was ever hostile or verbally abusive toward her.

Diba also denied that he ever bit Alkhaaliq or Miller, rammed Alkhaaliq with his head, or used the term "sand nigger." Diba recalled that he once asked Alkhaaliq if she was taking her children trick-or-treating for Halloween, and when she replied that she was going to church, he may have said that he thought she was Muslim. However, Diba did not consider their conversation to be religious in nature, and he never spoke about his own religion with anyone in the workplace.

On the date of Alkhaaliq's termination, Diba was upset because he could not find a conformed copy of a document that he needed for a court appearance the following day. Alkhaaliq minimized the seriousness of the situation and blamed Diba's paralegal for the missing document. Diba and Alkhaaliq argued about the issue for about 15 minutes. As

7

Diba was walking away from Alkhaaliq's work area, he yelled out "Jesus Christ" in frustration. In response, Alkhaaliq shouted to him, "Don't use the Lord's name in vain." When Diba asked Alkhaaliq what she had said and if she was talking back to him, she replied, "I could say what I want." Diba then told Alkhaaliq to take the rest of the day off. He did not consider her comment to be a religious statement, but rather an act of insubordination. Later that afternoon, Diba and Finnegan discussed the matter and made the decision to terminate Alkhaaliq's employment. Diba denied that the termination decision had anything to do with Alkhaaliq's race or religion.

### D. Finnegan's Testimony

Finnegan had been practicing immigration law since 1993. His practice primarily focused on deportation defense. Because he represented clients from diverse ethnic and cultural backgrounds, Finnegan found it helpful for the firm's employees to be fluent in foreign languages. He described the office environment as high-pressure and high-stress, and stated that it was common to hear employees use the term "Jesus Christ" in exasperation. Finnegan never heard Diba use any racial or anti-Christian epithets, and he never received any complaints from Alkhaaliq that she was being treated differently on the basis of her race or religion.

During Alkhaaliq's employment, Diba complained to Finnegan that Alkhaaliq was chronically late to work and that it was affecting the functioning of the firm's civil law department. Diba also complained that there were many clerical errors in Alkhaaliq's work product. Finnegan was not in the office on the morning that Diba sent Alkhaaliq home for being insubordinate. However, when Finnegan arrived later that afternoon, Diba discussed the matter with him. Finnegan believed that Alkhaaliq should be fired at that time based on Diba's repeated complaints about her work quality and Alkhaaliq's recent acts of insubordination. Diba agreed to terminate Alkhaaliq's employment and Finnegan sent her a text message to that effect later that day. They never discussed Alkhaaliq's race or religion in making the termination decision. Following Alkhaaliq's discharge, she was replaced by a Hispanic employee.

### III.   The Jury Verdict

At the conclusion of the trial, the jury returned a special verdict in favor of Finnegan & Diba and Diba on all remaining causes of action.  With respect to the discrimination and wrongful termination claims, the jury specifically found that Alkhaaliq's race and religious beliefs were not a substantial motivating reason for the decision to discharge her.  With respect to the battery claim, the jury found that Diba did not touch Alkhaaliq with an intent to harm her in either the alleged biting incident or the alleged head-ramming incident.  On January 3, 2014, following the entry of a judgment in favor of Finnegan & Diba and Diba, Alkhaaliq filed a timely notice of appeal.

### DISCUSSION

On appeal, Alkhaaliq argues that the trial court committed reversible error when it excluded the following three categories of evidence:  (1) Diba's alleged discriminatory treatment of other employees in Alkhaaliq's protected class following her termination; (2) Diba's alleged favorable treatment of employees outside Alkhaaliq's protected class during her employment, and (3) Diba's alleged remarks reflecting an anti-Christian bias.

### I.   Standard of Review

We review a trial court's ruling on the admissibility of evidence for an abuse of discretion.  (*McCoy v. Pacific Maritime Assn.* (2013) 216 Cal.App.4th 283, 295 (*McCoy*); *Ceja v. Department of Transportation* (2011) 201 Cal.App.4th 1475, 1481.)  "The trial court enjoys 'broad authority' over the admission and exclusion of evidence. [Citation.] . . . The trial court's authority is particularly broad 'with respect to rulings that turn on the relevance of the proffered evidence.'  [Citation.] Furthermore, '[i]t is for the trial court, in its discretion, to determine whether the probative value of relevant evidence is outweighed by a substantial danger of undue prejudice. . . .'  [Citation.]" (*McCoy, supra*, at pp. 295-296.)  In reviewing an evidentiary ruling, "the appellate court will not disturb the trial court's decision unless the trial court exceeded the limits of legal

9

discretion by making an arbitrary, capricious or patently absurd determination." (*Ceja v. Department of Transportation*, *supra*, at p. 1481.)

Even where evidence has been erroneously excluded, we will not reverse the judgment unless we conclude that the exclusion resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13; Evid. Code, § 354.) "'[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citation.]" (*Easterby v. Clark* (2009) 171 Cal.App.4th 772, 783.)

## II. Discriminatory Treatment of Other Employees in the Protected Class

### A. Relevant Background

Prior to trial, Finnegan & Diba brought two motions in limine to exclude any evidence of alleged acts of harassment by Diba, including Diba's purported harassment of Passion Miller, following Alkhaaliq's termination of employment. Finnegan & Diba argued that such evidence was irrelevant to Alkhaaliq's discrimination claims and created a substantial risk of undue prejudice.

In opposing the motions in limine, Alkhaaliq contended that Diba's discriminatory and harassing treatment of Miller was relevant to showing his racial animus against African-Americans. In making this argument, Alkhaaliq cited to portions of a declaration that Miller submitted in support of Alkhaaliq's summary adjudication opposition. In her declaration, Miller stated that, during a conversation between Diba and a coworker about the singer, Beyoncé, he turned to Miller and asked, "Is that how you say Beyoncé? Oh, is that racist?" On another occasion when Miller brought food into the office for a potluck, Diba allegedly asked her in front of all of her coworkers if she "had spit in it." Miller also stated that, after Alkhaaliq was terminated, Diba singled out Miller for "constant criticism" and yelled at her for "trivial errors at least once a day."

The trial court initially reserved its ruling on these motions in limine, and stated that it would address defense counsel's specific objections during the testimony of the

10

Alkhaaliq's witnesses. However, prior to the start of testimony, the trial court ruled that, as to "any type of action by the defendants against Passion Miller in terms of her race and religion or so forth, everything is cut off on the day of [Alkhaaliq's] termination." Alkhaaliq's counsel argued that evidence of Diba's conduct toward Miller following Alkhaaliq's termination was admissible because it showed that "Diba applied the same kind of harsh treatment to . . . Miller who was not his personal secretary." Alkhaaliq's counsel also asserted that, "with respect to racial comments, it doesn't matter where or when they were heard because . . . it's a discrimination case and goes to racial animus." The trial court disagreed, and reiterated that "this type of a situation is cut off at the date of termination."

## B.    Relevant Law

Evidence Code section 1101, subdivision (a) provides, in pertinent part, that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) Subdivision (b) of the statute, however, provides an exception to this rule, and states that "[n]othing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).)

In applying Evidence Code section 1101, subdivision (b) to actions for employment discrimination or harassment, California courts have held that evidence that an employer discriminated against other employees in the plaintiff's protected class, commonly referred to as "me too" evidence, may be admissible to prove that the employer acted with a discriminatory motive or intent in its adverse action against the plaintiff. (*McCoy*, *supra*, 216 Cal.App.4th at pp. 296-297; *Johnson v. United Cerebral Palsy/Spastic Children's Foundation* (2009) 173 Cal.App.4th 740, 766-777 (*Johnson*);

11

*Pantoja v. Anton* (2011) 198 Cal.App.4th 87, 109-110 (*Pantoja*).)  The relevance of evidence concerning an employer's conduct toward non-party employees is inherently "'fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case.'" (*Johnson*, *supra*, at p. 767.) "[S]imilar considerations are involved in balancing the probative value of the evidence against its prejudicial effect." (*Ibid.*)  "Me too" evidence is therefore not subject to any *per se* rule of exclusion, and may be admissible to prove an employer's motive or intent even where the conduct occurred outside the plaintiff's presence and at times other than when the plaintiff was employed.  (*Pantoja*, *supra*, at pp. 115-116; see also *Sprint/United Management Co. v. Mendelsohn* (2008) 552 U.S. 379, 381, 388 [evidence that employer discriminated against employees other than plaintiff "is neither *per se* admissible nor *per se* inadmissible," and instead "requires a fact-intensive, context-specific inquiry"].)

In *Pantoja*, for instance, the plaintiff sued her former employer and his firm for race and sex discrimination and hostile work environment harassment.  The trial court ruled, both before and during trial, that evidence of the employer's alleged discriminatory and harassing treatment of other female employees was only admissible if it occurred in the plaintiff's presence or adversely affected her work environment.  (*Pantoja*, *supra*, 198 Cal.App.4th at pp. 94, 99.)  The trial court thus excluded evidence of the employer's sexual harassment of other female employees who did not begin working at the firm until after the plaintiff's employment was terminated.  (*Id.* at pp. 97-99.)  The Court of Appeal held that the trial court abused its discretion in excluding such evidence because it "was admissible to show intent under Evidence Code section 1101, subdivision (b), to impeach [the employer's] credibility as a witness, and to rebut factual claims made by defense witnesses." (*Id.* at p. 110.)  As the Court of Appeal explained, "[t]he me-too evidence was relevant both to prove gender bias and to rebut the defense evidence that employer had a policy of not tolerating harassment and a practice of not directing profanity at individuals.  If, as the me-too evidence tended to show, [the employer] lacked this policy and practice when [the plaintiff] was not present and during times when she was not an employee, the jury could rationally infer that he also lacked them when she was an

12

employee and was present." (*Id.* at p. 116; see also *McCoy*, *supra*, 216 Cal.App.4th at p. 297 [trial court erred in excluding evidence of employer's alleged retaliatory acts against other employees because "evidence that a defendant intentionally retaliated against other employees for the same conduct engaged in by the plaintiff would be relevant" to proving its intent in the plaintiff's retaliation claim]; *Johnson*, *supra*, 173 Cal.App.4th at p. 767 [evidence of employer's discrimination against other employees was admissible under Evidence Code section 1101, subdivision (b) because it "sets out factual scenarios related by former employees of defendant that are sufficiently similar to the one presented by plaintiff concerning her own discharge by defendant"].)

### C. Application to Alkhaaliq's Case

On appeal, Alkhaaliq asserts that the trial court abused its discretion in excluding evidence of Diba's alleged discriminatory treatment of Miller following the termination of Alkhaaliq's employment. Alkhaaliq is correct that the trial court made an error of law when it applied a blanket rule of exclusion to any evidence of racial discrimination that occurred after her termination. As the Court of Appeal concluded in *Pantoja*, "me too" evidence may be admissible to prove an employer's discriminatory motive or intent even where the alleged conduct occurred at times when the plaintiff was not an employee. (*Pantoja*, *supra*, 198 Cal.App.4th at p. 116.) Diba's intent in terminating Alkhaaliq's employment was a central disputed issue at trial, and evidence that he discriminated against other African-American employees could be relevant to proving that he acted with a discriminatory intent in Alkhaaliq's discharge. It appears that, rather than assess the relevance of the proffered evidence in proving a race-based animus or motive by Diba, the trial court erroneously assumed that any evidence of discrimination following Alkhaaliq's discharge was *per se* inadmissible.

The record reflects, however, that the error was not prejudicial. The trial court's ruling precluded Alkhaaliq from presenting evidence of two remarks that Diba allegedly made to Miller after Alkhaaliq was terminated. The first remark concerned the correct pronunciation of a popular African-American singer's name, and the second was related

13

to Diba asking Miller if she spit in a dish she had made for an office potluck. Regardless of when these purported comments were made, they lack relevance to Alkhaaliq's race discrimination claims because they do not tend to show any racial animus or bias on the part of Diba. The remarks do not support an inference that Diba treated Miller differently from other employees on the basis of her race, or that Diba harbored a discriminatory animus against African-Americans as a group. Similarly, evidence that Diba yelled at Miller for making trivial work errors, without any reference to race, is not probative of whether he acted with a race-based motive in discharging Alkhaaliq. As the California Supreme Court has observed, "the FEHA is "not a 'civility code,'" and while the statute prohibits workplace discrimination and harassment against certain protected groups, it "does not outlaw . . . language or conduct that merely offends." (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 295.) Because the proffered "me too" evidence was not relevant to proving that Alkhaaliq was discharged on the basis of her race, she has failed to show any prejudicial error in its exclusion.

## III. Favorable Treatment of Employees Outside the Protected Class

### A. Relevant Background

In their motions in limine to exclude any evidence of acts of harassment by Diba, Finnegan & Diba also sought to exclude evidence of Diba's alleged harassment of Alkhaaliq. Finnegan & Diba specifically argued that evidence that Diba "singl[ed] out" Alkhaaliq for clerical errors and tardiness was not relevant to the causes of action being tried because Alkhaaliq was not asserting a separate cause of action for harassment. Alkhaaliq countered that such evidence was relevant to her race discrimination claims because it demonstrated that Diba treated her differently from other employees on the basis of her race. The trial court reserved its ruling on these portions of the motions in limine, and directed defense counsel to make proper objections during the witnesses' testimony.

In his examination of two of Alkhaaliq's former coworkers, Miller and Malave, Alkhaaliq's counsel asked each witness whether she had observed Diba's interactions

14

with the other employees in the office, and whether Diba treated Alkhaaliq differently from the non-African-American employees. The trial court sustained defense counsel's objections to these questions on relevance grounds because they were not related to Alkhaaliq's discrimination claims, and on foundational grounds because Alkhaaliq had not shown that the other employees were similarly situated to her in their job positions. The trial court also sustained defense counsel's objections to questions posed to Alkhaaliq's former coworker, Rubio, about what time other employees in the office were required to start work. The trial court noted that these questions should be directed at the supervisor who set the employees' work schedules and could testify about their respective job responsibilities.

During Alkhaaliq's direct examination, her counsel asked her if she ever observed other employees arrive to the office after 8:30 a.m. The trial court sustained defense counsel's relevancy objection, stating, "I think that would be an appropriate question if you first lay the groundwork as to what time they were to come in, what their responsibilities and duties were, and if there's a necessity they be there at a certain time." Her counsel then asked Alkhaaliq to describe the job duties of certain staff members and what time they were required to report to work. The trial court again sustained defense counsel's objection and explained, "If she was not managing any of these employees, she can't testify as to what their time responsibilities were. . . ." The court added, "If you ask if other persons were late, the relevancy would be in they had to be there [at] a certain time and what their job duties and responsibilities were at that particular point in time. I mean, if you're going to run the copying machine and you're to be there at nine o'clock and you get there at 9:05, it's different than if you are there to answer phones [at] nine o'clock when the office opens." When her counsel later asked Alkhaaliq if she ever observed Diba yell at other employees, the trial court also sustained an objection on relevancy grounds. Over defense counsel's objection, the court did allow Alkhaaliq to testify about why believed she was terminated on the basis of her race. However, when Alkhaaliq stated it was because Diba "treated [her] different than everyone else," the court granted defense counsel's motion to strike such testimony. The court noted,

15

"We're not involved in the treatment of all the employees here. We're only involved with this one employee."

## B. Relevant Law

In an employment discrimination action, evidence that the employer treated "similarly situated" employees outside the plaintiff's protected class "'more favorably'" than the plaintiff may be probative of the employer's discriminatory bias or intent. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 366; see also *Iwekaogwu v. City of Los Angeles* (1999) 75 Cal.App.4th 803, 817 ["comparative evidence of pretext . . . [is] evidence that [the plaintiff] was treated differently from others who were similarly situated"].) To prove discrimination by evidence that other employees were treated more favorably, the plaintiff must establish that those employees were "similarly situated" to the plaintiff "'in all *material* respects.'" (*Hawn v. Exec. Jet Mgmt., Inc.* (9th Cir. 2010) 615 F.3d 1151, 1157.) In general, "individuals are similarly situated when they have similar jobs and display similar conduct." (*Vasquez v. County of Los Angeles* (9th Cir. 2003) 349 F.3d 634, 641; see also *Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 172 ["employee is similarly situated if, among other things, he or she ""'engaged in the same conduct without any mitigating or distinguishing circumstances"""'].) "The employees' roles need not be identical," and evaluating whether they "are similarly situated . . . is a fact-intensive inquiry." (*Hawn v. Exec. Jet Mgmt., Inc.*, *supra*, at p. 1157.) The critical factor is that the other employees must be "similar or comparable" to the plaintiff in all relevant aspects, and the burden rests with the plaintiff to make that showing. (*Guz v. Bechtel National, Inc.*, *supra*, at p. 369 [plaintiff in age discrimination case failed to establish pretext where younger retained employees "performed distinct duties at disparate ranks and levels of responsibility"]; see also *Wills v. Superior Court*, *supra*, at pp. 172-173 [plaintiff failed to show discriminatory animus in discharge decision where coworkers' misconduct did not rise to same level as misconduct committed by plaintiff].)

## C. Application to Alkhaaliq's Case

Alkhaaliq contends that the trial court prejudicially erred in excluding evidence that Diba treated similarly situated employees outside her protected class more favorably. She claims the four other staff members employed by the firm were similarly situated to her in all material respects because they were supervised by Diba, performed similar job duties, and engaged in similar misconduct by being tardy to work or making minor errors. Contrary to Alkhaaliq's characterization, however, the trial court did not preclude her from presenting any evidence of Diba's alleged favorable treatment of similarly situated non-African-American employees. Rather, the trial court ruled that Alkhaaliq had to lay a proper foundation for such evidence by eliciting testimony from either the other workers or their supervisors about their respective job duties and work schedules. In other words, the trial court ruled that before Alkhaaliq could ask the witnesses whether Diba treated Alkhaaliq less favorably than the other employees in the firm, she had to show that such employees were similarly situated to her.

The record reflects that Alkhaaliq called two non-African-American employees, Malave and Rubio, to testify at trial, and her counsel was permitted to examine these witnesses about their job responsibilities, whether they were required to report to work at a certain time, and, in the case of Rubio, whether she was chronically late to work. When Alkhaaliq's counsel tried to elicit testimony about the work habits of other employees, however, the trial court properly advised her counsel that such questions should be directed at the supervisors who set the work schedules for those employees and could testify about their job duties. The trial court made a similar ruling when Alkhaaliq's counsel sought to elicit testimony from Alkhaaliq about the work schedules of her coworkers, whether they were ever late to work, and whether it was important for them to start work on time. As the court explained, Alkhaaliq's counsel could "argue to the jury whether it was important for a certain employee to be there on time or not and what was the policy of the company on it," but Alkhaaliq was not the proper witness to testify about these matters if she did not supervise the employees. Notwithstanding this ruling, Alkhaaliq did not call either Diba or Finnegan to testify about the job responsibilities of

17

the employees whom they supervised. Although both Diba and Finnegan were later called as witnesses by the defense, Alkhaaliq's counsel did not cross-examine either supervisor about the job duties, work schedules, or performance issues of any of Alkhaaliq's co-workers.

Moreover, Diba testified at trial that one of Alkhaaliq's primary job duties as his secretary was to be in the office by 8:30 a.m. so that she would be available to call the court on his behalf if he was running late for a scheduled appearance. He further testified that he did not require any other employees to perform this essential job function. Alkhaaliq nevertheless asserts that Malave, the firm's former receptionist, was similarly situated to her because Malave testified that she was responsible for opening the office each morning, and thus, she also had to be at work by a designated time. However, Alkhaaliq never sought to establish at trial that Malave was late to work without being disciplined, and in fact, the evidence showed that Malave was discharged by the firm when she failed to report to work on one occasion. Alkhaaliq also suggests that Rubio, Finnegan's paralegal, was similarly situated to her because Rubio admitted that she was chronically late to work. However, there was no showing that Alkhaaliq and Rubio had similar job duties, and Rubio testified that her job did not require her to start work at a specific time. On this record, Alkhaaliq failed to make a foundational showing that any employees outside her protected class were similarly situated to her. Therefore, the trial court did not abuse its discretion in precluding Alkhaaliq's witnesses from generally testifying whether Diba treated non-African-American employees more favorably than Alkhaaliq.

IV.    **Stray Remarks About Religion**

    A.    **Relevant Background**

Prior to the start of trial, Finnegan & Diba also brought several motions in limine to exclude evidence of statements allegedly made in the workplace about Diba's religious practices and beliefs. In particular, Finnegan & Diba sought to exclude evidence that Diba told other employees in the office that he was fasting, and that Rubio explained to Alkhaaliq that Diba was fasting because of the Muslim tradition of Ramadan. Finnegan

18

& Diba also moved to exclude evidence of a comment that Diba allegedly made during the firm's Christmas luncheon that "Muslims are the most hated religion in the world." In addition, Finnegan & Diba requested the exclusion of evidence that Diba repeatedly over-exaggerated the pronunciation of Alkhaaliq's last name. Finnegan & Diba argued that such evidence was not relevant to proving that Alkhaaliq's discharge was motivated by religious animus, and was likely to confuse the jury and cause prejudice.

The trial court granted these motions. The court ruled that testimony that Diba was Muslim, or that Alkhaaliq believed him to be Muslim, was not relevant to whether Diba discharged Alkhaaliq because she was Christian. The court similarly excluded as irrelevant Diba's alleged remark about Islam being the most hated religion, and his purported mispronunciation of Alkhaaliq's last name. Over defense counsel's objection, the trial court allowed evidence of Diba's alleged questions to Alkhaaliq about going to a mosque, and his alleged use of the term "sand nigger," on the ground that such evidence was relevant to Alkhaaliq's race and religious discrimination claims.

### B.    Relevant Law

In an employment discrimination action, a decision maker's derogatory remarks about the plaintiff's protected class may constitute evidence of a discriminatory animus or intent. (*Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133, 152-153; *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 539-540.) Even an isolated discriminatory "remark not made directly in the context of an employment decision or uttered by a nondecision maker may be relevant, circumstantial evidence of discrimination." (*Reid v. Google, Inc.*, *supra*, at p. 539.) "Although stray remarks may not have strong probative value when viewed in isolation, they may corroborate direct evidence of discrimination or gain significance in conjunction with other circumstantial evidence." (*Id.* at p. 541.) "[W]ho made the comments, when they were made in relation to the adverse employment decision, and in what context they were made are all factors that should be considered." (*Ibid*; see *Gibbs v. Consolidated Services* (2003) 111 Cal.App.4th 794, 801 [supervisor's "'stray'" age-based remark that "played no role in the decision to terminate" plaintiff was

19

insufficient to show discriminatory intent]; *Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 809 ["isolated remark" that was "highly ambiguous as far as discriminatory animus" was "entitled to virtually no weight in considering whether the [plaintiff's] firing was pretextual"].)  In deciding whether to exclude evidence of stray remarks at trial, the trial court must weigh the probative value of the challenged remark against the likelihood that its admission would lead to confusion or undue prejudice. (*McCoy*, *supra*, 216 Cal.App.4th at p. 296; *Pantoja*, *supra*, 198 Cal.App.4th at p. 123.)

###   C.   Application to Alkhaaliq's Case

Alkhaaliq argues that the trial court erred in excluding evidence of the stray remarks allegedly made about Diba's religious beliefs because such statements were relevant to showing that Diba harbored a discriminatory animus toward other religions, particularly Christianity.  This claim lacks merit.  Evidence that Alkhaaliq believed Diba was Muslim because he told others in the office that he was fasting for Ramadan is not remotely probative of whether Diba had a religious bias against non-Muslim employees. Simply put, the fact that Diba may be Muslim does not prove that he hates Christians. Similarly, evidence that Diba once commented at a Christmas party that Islam was "the most hated religion in the world" does not reasonably support an inference that he held a discriminatory animus against Christians or any other religious group.  While Alkhaaliq asserts that Diba's comment reflected a deep animus toward other religions, she does not support her claim with any reasoned argument and instead relies on her own speculation about his intent.  Evidence that Diba exaggerated the pronunciation of Alkhaaliq's last name is likewise irrelevant to proving that he discriminated against her on the basis of her religion.  Alkhaaliq suggests that Diba's mispronunciation was an attempt to make fun of her "Muslim-sounding name," but fails to explain how such conduct shows any religious bias by Diba against non-Muslim employees.  Even when considered in conjunction with the evidence that the trial court admitted, these stray remarks do not tend to prove that Diba terminated Alkhaaliq's employment because she is Christian.  Consequently, the trial court did not abuse its discretion in excluding the proffered evidence.

20

## V.    Respondents' Motion for Sanctions

Respondents have moved for sanctions in the amount of $27,250 in attorney's fees on the ground that Alkhaaliq filed a frivolous appeal that was motivated by a personal attack on Diba. An appellate court may impose monetary sanctions on a party or attorney when it determines that an appeal is frivolous or taken solely to cause delay. (Code Civ. Proc., § 907; Cal. Rules of Court, rule 8. 276(a).) "[A]n appeal should be held to be frivolous only when it is prosecuted for an improper motive -- to harass the respondent or delay the effect of an adverse judgment -- or when it indisputably has no merit -- when any reasonable attorney would agree that the appeal is totally and completely without merit. [Citation.]" (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650.) Although we are affirming the judgment on the ground that Alkhaaliq has failed to show any prejudicial error in the trial court's evidentiary rulings, we do not believe that Alkhaaliq's appeal was completely devoid of merit, nor is there any evidence that it was prosecuted for an improper purpose. We accordingly deny the motion for sanctions.

## DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.


ZELON, J.

We concur:


PERLUSS, P. J.


FEUER, J.*

---

*    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21